## DONEGAL MUTUAL INSURANCE COMPANY,

v.

**Richard BAUMHAMMERS; Andrejs Baumhammers; Inese Baumhammers; May–Ling Kung, Administratrix of the Estate of Ji–Ye Sun, and May–Ling Kung, in her own right; Sanford Gordon, Administrator of the Estate of Anita Gordon, and Sanford**

Gordon in his own right; Zetta Renee Lee, Administratrix of the Estate of Garry Lee, Jane/John Doe, Administrator of the Estate of Anil Thakur; Bang Ngoc Ngo, Administrator of the Estate of Thao Q. Pham; Sandip Patel, and United Services Automobile Association

Appeal of: Sanford Gordon, Administrator of the Estate of Anita Gordon, and Sanford Gordon in his own right, Appellant.

Appeal of: Andrejs Baumhammers and Inese Baumhammers, Appellants.

Appeal of: Sandip Patel, Appellant.

Appeal of United Services Automobile Association, Appellant.

Appeal of: Zetta Renee Lee, Administratrix of the Estate of Garry Lee, Appellant.

Appeal of: May–Ling Kung, Administratrix of the Estate of Ji–Ye Sun, and May–Ling Kung in her own right, Appellant.

Appeal of Bang Ngoc Ngo, Administratrix of the Estate of Thao Q. Pham, Deceased: Bang Ngoc Ngo, Guardian of Chris Pham; and Bang Ngoc Ngo; and Cathleen Cawood Bubash, Administratrix of the Estate of Anil Kumar Thakur, Deceased; Shabha Thakur, Guardian of Noopar Kumar and Vikas Kumar Thakur, Appellants.

Donegal Mutual Insurance Company, Appellant,

v.

Richard Baumhammers; Andrejs Baumhammers; Inese Baumhammers; May–Ling Kung, Administratrix of the Estate of Ji–Ye Sun, and May–Ling Kung, in her own right; Sanford Gordon, Administrator of the Estate of Anita Gordon, and Sandford Gordon in his own right; Zetta Renee Lee, Administratrix of the Estate of Garry Lee, Jane/John Doe, Administrator of the Estate of Anil Thakur; Bang Ngoc Ngo, Administrator of the Estate of Thao Q. Pham; Sandip Patel, and United Services Automobile Association, Appellees.

United Services Automobile Association

v.

Richard Baumhammers; May–Ling Kung, Administratrix of the Estate of Ji–Ye Sun, and May–Ling Kung, in her own right; Sanford Gordon, Administrator of the Estate of Anita Gordon, and Sandford Gordon in his own right; Zetta Renee Lee, Administratrix of the Estate of Garry Lee, Sandip Patel; Andrejs Baumhammers; Inese Baumhammers; and Donegal Mutual Insurance Company.

Appeal of: Donegal Mutual Insurance Company, Appellant.

United Services Automobile Association, Appellant,

v.

Richard Baumhammers; May–Ling Kung, Administratrix of the Estate of Ji–Ye Sun, and May–Ling Kung, in her own right; Sanford Gordon, Administrator of the Estate of Anita Gordon, and Sandford Gordon in his own right; Zetta Renee Lee, Administratrix of the Estate of Garry Lee, Sandip Patel; Andrejs Baumhammers; Inese Baumhammers; and Donegal Mutual Insurance Company, Appellees.

Superior Court of Pennsylvania.

Argued Sept. 7, 2005.
Filed Feb. 17, 2006.

800

William Caroselli, Pittsburgh, for Gordon, Anita and Sanford.

James J. Ross, Ampridge, for Lee, Garry.

Charles Knoll, Pittsburgh, for Pham, Chris.

Louis M. Tarasi and Christine K. Hurnyak, Pittsburgh, for Patel.

William P. Chapas, Pittsburgh, for Sun.

Richard B. Tucker, Pittsburgh, for Baumhammers, Inese and Andrejs.

Louis C. Long, Pittsburgh, for Donegal Mutual.

Richard B. Morrison, Philadelphia, for United Services.

BEFORE: DEL SOLE, P.J., FORD ELLIOTT, STEVENS, MUSMANNO, ORIE MELVIN, LALLY–GREEN, TODD, McCAFFERY and PANELLA, JJ.

OPINION BY TODD, J.:

¶ 1 In these consolidated declaratory judgment actions, we decide whether two insurers, Donegal Mutual Insurance Company ("Donegal") and United Services Automobile Association ("USAA"), have a duty to defend or indemnify their insureds for events that occurred on April 28, 2000. On that date, Richard Baumhammers ("Baumhammers"), the son of Andrejs and Inese Baumhammers ("Parents"), went on a shooting spree, killing five people and

seriously injuring another. As we discuss below, we agree with the trial court that Donegal is obligated to defend and, if necessary, indemnify Parents because the alleged negligence of parents constitutes an occurrence under that policy, and that the shooting of each victim was a separate occurrence. We also conclude that the USAA policy contains an enforceable exclusion, precluding coverage under that policy for the events at issue. We therefore affirm.

¶ 2 Initially, we set forth the tragic circumstances of April 28, 2000. On that date, Baumhammers left his home and went to the home of his neighbor, Anita Gordon. While there, he shot and killed Gordon and set fire to her home. He then drove to Scott Township, entered an Indian grocery store, and shot and killed Anil Thakur, seriously wounding Sandip Patel in the process. Next, Baumhammers drove to the Robinson Town Center in Robinson Township, entered a Chinese restaurant, and shot and killed both Ji–Ye Sun and Thao Qak Pham. Proceeding to Center Township, Baumhammers entered the C.S. Kim Karate School and shot and killed Garry Lee. The entire series of events occurred in a span of less than two hours, with crimes occurring across four separate municipalities and two counties.

¶ 3 On May 9, 2001, Baumhammers was convicted by a jury of first-degree murder in connection with each of the five victims who died and attempted homicide and aggravated assault for the shooting of Patel.[1] The jury rejected Baumhammers' claim that he was not guilty by reason of insanity.

¶ 4 On September 25, 2000, Sanford Gordon ("Gordon"), individually and as executor of the estate of his wife, Anita Gordon, instituted a wrongful death and survival action against Baumhammers and Parents. As to Baumhammers, it was alleged that he negligently, recklessly, or intentionally shot the victim and that he suffered from a mental illness at the time. (Complaint filed by Sanford Gordon (Exhibit 2 to Donegal's Amended Complaint) at ¶¶ 14–18 (R.R. 37a–38a).) Gordon further alleged the existence of a special relationship between Baumhammers and Parents. (*Id.* at ¶¶ 20 (R.R. 38a).) Citing that relationship, the complaint contained various allegations of negligence as to Parents, including averments that they should have taken possession of Baumhammers' gun or alerted authorities or mental health care providers about Baumhammers because they knew or should have known of his dangerous propensities and his possession of the gun. (*Id.* at ¶¶ 21, 25 (R.R. 39a–40a).)

¶ 5 On October 3, 2001, Cathleen Cawood Bubash, as administratrix of the estate of Anil Kumar Thakur, deceased, and Shabha Thakur, individually and as guardian of Noopar Kumar and Vikas Kumar Thakur, instituted a wrongful death and survival action against Baumhammers and Parents based on the shooting death of Anil Thakur; they raised the same allegations of negligence as to Parents as did Gordon. Sandip Patel, who was rendered a quadriplegic as a result of the shooting, commenced a personal injury action against Baumhammers and Parents on February 20, 2001. Patel's allegations against Parents were identical to those of Gordon. On June 19, 2000, May–Ling Kung, individually and as administratrix of the Estate of Ji–Ye Sun, deceased, filed a

1. Baumhammers also was convicted of simple assault, ethnic intimidation, criminal mischief, arson, reckless endangerment, and carrying an unlicensed firearm. *See Commonwealth v. Baumhammers,* Nos. CC 200014712–200014714 (Allegheny County Common Pleas verdict May 9, 2001).

wrongful death and survival action against Baumhammers and Parents,[2] and her allegations of negligence against Parents were substantially similar to those in the other three actions. On August 9, 2001, Bang Ngoc Ngo, individually and as administratrix of the Estate of Thao Q. Pham, deceased, and as guardian of Chris Pham, initiated a wrongful death and survival action against Baumhammers and Parents based on the shooting death of Thao Pham. That complaint contained identical allegations of negligence against Parents as those pled in the action filed by Gordon. On September 26, 2000, Zetta Renee Lee, administratrix of the Estate of Garry Dewane Lee, deceased, instituted a wrongful death and survival action against Baumhammers and Parents based on the shooting death of Garry Lee.[3] Her allegations against Parents were identical to those of Gordon. We refer to the plaintiffs in the described underlying civil actions collectively as "Plaintiffs."

¶ 6 The underlying actions filed by Plaintiffs, as noted, were filed between June 19, 2000, and October 3, 2001, and later consolidated. On March 25, 2002, the trial court granted Plaintiffs leave to amend their complaints to state a claim under the Restatement (Second) of Torts § 319.[4]

¶ 7 Two insurance policies were implicated in these actions, a homeowner's policy and an umbrella policy, both issued to Parents. The homeowner's policy, issued by Donegal Insurance, provided defense and indemnity coverage for a claim or suit brought against an insured for bodily injury "caused by 'an occurrence.' " An "occurrence" was defined in relevant part as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results ... in: Bodily injury or Property damage." (Donegal Insurance Policy (Exhibit 6 to Donegal's Amended Complaint) at 1 (R.R. 81a).) The liability limits of the Donegal policy were $300,000 for each occurrence. The policy covered the two named insureds, Andrejs and Inese Baumhammers, and any relative who was a resident of their household. Thus, Richard Baumhammers, who resided with Andrejs and Inese, fell within the definition of an insured. The Donegal policy also contained an exclusion for bodily injury that is expected or intended by "the insured."[5]

¶ 8 USAA issued an excess or umbrella insurance policy to Parents. That policy provided coverage for named insured Andrejs Baumhammers and any relative who was a resident of his household; consequently, Inese and Richard Baumhammers met the definition of "insureds." Like the Donegal policy, the USAA policy provided coverage for an "occurrence," which was defined two ways. The term "occurrence"

2. Although Parents were not named initially as defendants in the action filed by Kung, they were added in an amended complaint, which was permitted by court order.

3. Although Parents were not initially named as defendants in the action filed by Lee, she was granted the right to amend her complaint to add Parents as defendants.

4. The Restatement (Second) of Torts § 319 provides: "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him doing such harm."

5. The Donegal policy was amended to include language that extended the exclusion to bodily injury that was expected or intended by "one or more 'insureds.' " However, Donegal concedes that it mistakenly communicated its intentions to Parents when the amendment was made and, as a result, does not rely upon the amended exclusion in this case. (See Brief for Appellant at 6 n. 1; Trial Court Opinion, 8/7/02, at 11.)

first was defined as an "accident ... which results ... in bodily injury." (USAA Insurance Policy (Exhibit 5 to Donegal's Amended Complaint) at 1 (R.R. 71a).) In addition, the USAA policy described an "occurrence" as an "event or series of events ... caused by an act or omission of any insured, which results ... in personal injury, neither expected nor intended from the standpoint of the insured."[6] (*Id.*) The USAA policy also contains two exclusions. The first one excluded coverage for bodily injury or property damage "caused by the intentional or purposeful acts of *any* insured." (*Id.* at 3 (R.R. 73a) (emphasis added).) The second exclusion provided that the policy did not apply to "[b]odily injury, personal injury or property damage arising out of a malicious or criminal act or omission by, or with either the knowledge or consent of, *any* insured regardless of whether such insured is actually charged with, or convicted of, a crime." (*Id.* (emphasis added).)

¶ 9 On October 30, 2000, USAA instituted a declaratory judgment action at No. G.D. 00–18199. Donegal filed a separate declaratory judgment action at No. G.D. 01–05671 on March 22, 2001. The insurers sought a ruling that they had no duty to defend or indemnify Parents or Baumhammers in the actions filed by Plaintiffs.[7] The declaratory judgment actions were consolidated by order of July 12, 2001.

¶ 10 Following discovery, all parties moved for summary judgment. After oral argument, the trial court, by the Honorable Eugene Strassburger, entered an order on December 19, 2001: 1) granting

USAA's motion and declaring that it had no duty either to defend or indemnify any of its insureds under an exclusion; 2) granting Donegal's motion as to Baumhammers, declaring that Donegal had no duty to defend or indemnify him; 3) denying Donegal's motion as to Parents; and 4) stating that Donegal had a duty to defend and indemnify Parents and that there were six occurrences under the policy, exposing Donegal to $1.8 million in coverage. As the trial court noted in its opinion, the declaration as to the duty to indemnify will have no effect unless Parents are found liable to Plaintiffs in the underlying civil actions. The trial court then granted reconsideration and considered additional evidence. On June 6, 2002, the court reinstated its December 19, 2001 order, and these appeals and cross-appeals followed.

¶ 11 Initially, a panel of this Court affirmed the trial court's decision with respect to the USAA policy, but reversed its decision with respect to the Donegal policy. That decision was withdrawn, however, and we granted reargument *en banc* on December 17, 2004. Oral argument was heard in this matter on September 7, 2005.

¶ 12 Preliminarily, we note that our standard of review in a declaratory judgment action is plenary because we are reviewing the trial court's legal interpretation of an insurance policy in light of claims raised in the underlying complaints. *Kvaerner Metals Div. of Kvaerner U.S. v. Commercial Union Ins. Co.*, 825 A.2d 641 (Pa.Super.2003), *appeal granted*, 577 Pa.

---

6. The parties herein do not dispute the definition of "occurrence" contained in the USAA policy. However, the trial court indicated that the USAA umbrella policy was purchased in 1988 and applied to occurrences covered by the primary policy. In 1997, that policy was revised. The revisions were sent with a conspicuous notice that some of the changes

resulted in a reduction in coverage. The above two definitions of occurrence were added at that time.

7. Nevertheless, Donegal undertook the defense of Baumhammers and Parents in the underlying actions instituted by Plaintiffs, subject to a reservation of rights.

667, 848 A.2d 925 (2004). Furthermore, when construing the language of an insurance policy, our goal is to ascertain the intent of the parties as manifested by the language of the written instrument. *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 735 A.2d 100 (1999). If the language is not clear, it is construed in favor of the insured, but where the language of the contract is clear and unambiguous, a court is required to give effect to that language. *Id.; Standard Venetian Blind Co. v. American Empire Ins. Co.*, 503 Pa. 300, 469 A.2d 563 (1983). Contractual terms "are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Madison Constr. Co.*, 557 Pa. at 606, 735 A.2d at 106.

### *The Donegal Policy*

¶ 13 We first consider whether the trial court erred in concluding that the Donegal policy provides coverage to Parents for Baumhammers' conduct, and thus that Donegal is required to defend and indemnify Parents.[8] The policy provides coverage for an "occurrence," which is clearly and unambiguously defined as an "accident," although "accident" is not further defined. Donegal asserts that Baumhammers' intentional conduct cannot be considered an accident, and thus there is no coverage. Parents and Plaintiffs assert, to the contrary, that from the viewpoint of Parents, and in light of the allegations of their negligence, the shootings were an accident, and thus an occurrence.

¶ 14 There are three Pennsylvania cases that address the precise insurance language at issue in this case: *Gene's Restaurant, Inc. v. Nationwide Ins. Co.*, 519 Pa. 306, 548 A.2d 246 (1988), *Britamco Underwriters, Inc. v. Grzeskiewicz*, 433 Pa.Su-

per. 55, 639 A.2d 1208 (1994), and *Britamco Underwriters, Inc. v. Weiner*, 431 Pa.Super. 276, 636 A.2d 649 (1994). In order to avoid confusion, we refer to the latter two cases as *Grzeskiewicz* and *Weiner*, respectively.

¶ 15 We first examine our Supreme Court's pronouncement in *Gene's Restaurant*. In that case, the insurance contract provided coverage for bodily injury resulting from an occurrence, and the term occurrence was defined as an accident. The insured, a restaurant, was sued for its employee's intentional assault and beating of a restaurant patron. The insurer refused to defend, and the insured initiated an action to recover the costs of defending the underlying action. Our Supreme Court held that coverage under the policy was not triggered because the "willful and malicious assault alleged in the complaint is not an accident but rather is an intentional tort. As such, it is not covered by the policy and, therefore, the insurer owed no duty to defend." *Id.* at 309 n. 1, 548 A.2d at 247 n. 1; *see also Minnesota Fire and Cas. Co. v. Greenfield*, 579 Pa. 333, 345 n. 6, 855 A.2d 854, 861 n. 6 (2004) (plurality) (citing *Gene's Restaurant* and reiterating that "an occurrence requires an accidental event"). The insured argued that it neither expected nor intended the plaintiff's injuries, and therefore, the insurer did have a duty to defend. The Court rejected that argument, stating, "[s]uch a reading ignores the policy requisite that the 'occurrence' must be an accident which a malicious, willful assault and beating could never be." *Gene's Restaurant*, 519 Pa. at 309 n. 1, 548 A.2d at 247 n. 1; *see also Gene & Harvey Builders, Inc. v. Pennsylvania Mfrs. Ass'n Ins. Co.*, 512 Pa. 420, 427, 517 A.2d 910, 913 (1986) ("The alleged intentional concealing of the

---

**8.** The trial court's determination that insurance coverage is unavailable to Baumham-

mers, in contrast to Parents, is unchallenged on appeal.

condition of the land or the alleged intentional misrepresentation are not 'occurrences' under the policy, for an intentional act is not an accident (and only accidents are covered).")

▮ ¶ 16 Unlike in the instant case, however, in *Gene's Restaurant* there were no allegations of negligence on the part of the insured, the restaurant. Thus, the Court came to the unexceptional conclusion that an intentional tort was not an "accident." It was not faced with, and thus did not address, whether an insured's negligent act, which results in another insured's intentional attack, can be considered an accident, and thus an occurrence.

¶ 17 This Court relied on *Gene's Restaurant* in two subsequent cases: *Weiner, supra,* where we distinguished it, and *Grzeskiewicz, supra,* where we extended it. In *Weiner,* the insurance contract in question provided coverage for "an occurrence," defined as "an accident." Therein, a bar patron was assaulted and sued the bar. The patron alleged that she suffered injuries as a result of an altercation; she claimed, however, that her injuries were inflicted either negligently or intentionally:

> [C]ount one of the complaint entitled "Assault and Battery" describes the acts in question as "intentional," "willful," and "malicious." However, paragraph 13 of Davis's complaint refers to the incident in question as an "accident." In addition, counts two and three of Davis's complaint assert alternative theories of recovery sounding in negligence—e.g., negligent infliction of emotional distress, failing to provide adequate protection for business invitees, hiring or otherwise employing an individual with propensities for doing violence and/or inflicting mental distress on invitees, etc.

*Weiner,* 431 Pa.Super. at 282, 636 A.2d at 652. The *Weiner* Court noted that, by contrast, in *Gene's Restaurant,* "the complaint alleged *only* the willful and malicious assault and beating of one of its patrons." *Weiner,* 431 Pa.Super. at 282, 636 A.2d at 652 (emphasis original). Since there was a possibility under the factual averments of the complaint in *Weiner* that the patron's injuries "were either the result of an 'accident,' or intentional or negligent acts of the insured Eagle Bar and/or its employees," *id.,* we concluded that the insurer had a duty to defend. *Id.*

¶ 18 In *Grzeskiewicz,* this Court examined a policy that provided coverage for bodily injury resulting from an occurrence, likewise defined as "an accident." The underlying action involved an insured doing business as a bar, as in *Weiner,* which the insurer had defended under a reservation of rights. A patron of the bar alleged that she had been attacked intentionally with a broken beer bottle by another patron of the bar. The victim sued the other patron and the bar, alleging the intentional acts of the patron, and alleging that her injuries were caused by the bar's careless, reckless, or negligent disregard of her welfare by its employees.

¶ 19 Although the allegations against the bar sounded in negligence, a panel of this Court concluded that there was no coverage, noting that the victim's injuries, as alleged in the complaint, resulted from an intentional act. Even though our Supreme Court's decision in *Gene's Restaurant* did not address negligence claims, the panel relied on that decision's conclusion that a willful assault could not constitute an accident, and thus did not constitute an occurrence. *Grzeskiewicz,* 433 Pa.Super. at 60–61, 639 A.2d at 1210–11. The panel also distinguished *Weiner* as follows:

> In contrast to this case, the plaintiff in *Weiner* did not set forth a separate count against the individual(s) who allegedly struck him in the neck. In fact, the underlying complaint in *Weiner* alleged

that he was struck by one of the owners of the bar and/or by one of the bar's employees. In addition, the plaintiff there did not allege that he received his injuries solely as the result of the intentional acts of one or more of the defendants. Specifically, paragraph 23 of the *Weiner* complaint averred that the "defendants (including the bar, the owners of the bar, and an employee) intentionally, recklessly **and/or negligently** performed the aforementioned acts...." We held, therefore, that because the plaintiff's claims may potentially come within the coverage of the Britamco policy, Britamco owed the bar a duty to defend. Such is not the case here.

*Id.* at 61–62, 639 A.2d at 1211 (citations omitted) (emphasis original).

¶ 20 Since the underlying act at issue was intentional, as established by the factual averments in the complaint, the *Grzeskiewicz* Court held that there was no occurrence,[9] essentially concluding that, regardless of whether negligence by an insured may have led to the incident, unless the actor himself is alleged to have negligently caused the injuries, the incident may not be viewed an accident. We now find this conclusion to be erroneous in that it reads *Gene's Restaurant* too broadly and *Weiner* too narrowly. As we noted above, *Gene's Restaurant* did not address whether an insured's negligent act, which results in another insured's intentional attack, can be considered an accident. In that case, there were no allegations of negligent conduct by any insured. Thus, we conclude that *Gene's Restaurant* did not compel the result in *Grzeskiewicz*.

¶ 21 Conversely, the *Grzeskiewicz* Court focused on the allegation in *Weiner* that

the actor may have acted negligently, and seemingly overlooked the additional feature of our analysis in *Weiner*, wherein we noted that the patron's injuries "were either the result of an 'accident,' or intentional *or negligent acts of the insured Eagle Bar* and/or its employees." *Weiner*, 431 Pa.Super. at 282, 636 A.2d at 652 (emphasis added). Thus, the holding in *Weiner* was not as narrow as was characterized by the *Grzeskiewicz* Court. *See Grzeskiewicz*, 433 Pa.Super. at 64–65, 639 A.2d at 1212 (Beck, J., concurring) (rejecting the Majority's attempt to distinguish the acts in *Weiner* as accidental, noting that "[t]hey appear to have been as intentional as the acts alleged in this case.").

¶ 22 In this regard, we find persuasive the analysis in *Nationwide Mut. Fire Ins. Co. of Columbus v. Pipher*, 140 F.3d 222 (3d Cir.1998) (applying Pennsylvania law). In that case, an apartment owner, *inter alia*, removed and negligently failed to reinstall the doors to a tenant's apartment, which negligence allegedly led to the tenant's murder by a workman hired by the owner. In the suit by the tenant's husband, the insurance carrier for the owner denied coverage, citing occurrence language similar to that in the instant case. In reviewing the carrier's declaratory judgment action, the Third Circuit distinguished *Gene's Restaurant*, finding critical the fact that in *Gene's Restaurant* there were no allegations of negligence:

Because the complaint alleged *solely* an intentional act and contained *no* allegations of negligence on the part of its insured, the *Gene's Restaurant* court came to the unremarkable conclusion that an intentional tort was not an acci-

---

**9.** The *Grzeskiewicz* Court came to the same result on the alternative ground that specific language in the assault and battery exclusion in the policy prohibited coverage for claims concerning the alleged failure of the insured to prevent an assault and battery. *Id.* at 62–63, 639 A.2d at 1211.

dent and thus not a covered occurrence under the policy.

*Id.* at 225 (emphasis original).

¶ 23 The *Pipher* court noted that, by contrast, there were numerous allegations of negligence on the part of the apartment owner in *Pipher,* concluding:

> Although [the tenant's] death was the direct result of a third party's intentional conduct, the complaint alleges that the insured's own negligence also played a significant part in her death. In the absence of any Pennsylvania Supreme Court precedent directly on point, we believe that if confronted with this question, that court would find this distinction alone to be sufficient to hold that an insurance company has a duty to defend its insured against complaints alleging negligent conduct on the part of the insured as well as a third party's intentional conduct.

*Id.* Thus, the Court held that "it is the intentional conduct of the *insured* which precludes coverage, not the acts of third parties." *Id.* at 226 (emphasis original). This analysis supports our conclusion that *Gene's Restaurant* did not dictate the result in *Grzeskiewicz. Cf. Pipher,* 140 F.3d at 229 (Alito, J., concurring) (noting that although *Grzeskiewicz* was otherwise dispositive, it was not properly followed in light of our Supreme Court decisions).

¶ 24 Moreover, the holding in *Grzeskiewicz* produces an anomalous result: it allows for coverage under policies such as the Donegal policy where the insured himself *negligently* causes injury, but not where the insured negligently enables another actor to intentionally cause injury. This Court discussed just such an anomaly in *Board of Public Educ. of Sch. Dist. Of Pittsburgh v. National Union Fire Ins.,* 709 A.2d 910, 915 (Pa.Super.1998) (*en banc*), in the context of an errors and omissions policy of a school district that was sued for negligence in not preventing the volunteer president of a parent-teacher organization from allegedly molesting one of the students. The policy excluded claims "involving ... criminal acts." *Id.* at 914 (quoting policy). In rejecting application of the exclusion, however, this Court noted that the criminality alleged was one party removed from the insured school district, that the claim did not involve the criminality of school district itself. This Court reasoned:

> Thus the insurer, to avail itself of this exclusion, would interpret the policy to mean "We will defend you against claims of your own negligence, and claims your negligence allowed others to cause injury negligently, but if by reason of that identical negligence any other person acts criminally, you're on your own." That is, under [insurer's] interpretation, the exact same allegations of the district's negligence could result in coverage, or not, dependent solely on the degree of culpability alleged on the part of parties other than the insured district itself. This would be an anomalous result at best, allowing one's right to a defense against covered claims to rise or fall solely on the alleged nature of the acts of others.

> Exclusion (a) does not specify whether a criminal act committed by a non-insured is meant to excuse coverage. If three separate entities are insured, can criminality by one deprive the other two of coverage? If the conduct of one insured is arguably criminal, can the insurer refuse to defend innocent or merely negligent insureds who had no complicity in the criminal acts? Put another way, can allegations of negligence against an insured, clearly covered by the policy, be swept outside the policy's ambit solely by the nature of the allegations against another insured? We think not. *A for-*

*tiori*, if the criminal actor is not even an insured, we will not preclude coverage absent exclusionary language expressly dictating such a result. Allowing the insurer to deny a defense against claims sounding entirely in negligence to an entire roster of law-abiding people and groups because of alleged criminality by a single "volunteer" cannot be what the parties bargained for.

*Id.* at 915 (footnote omitted).

¶ 25 Likewise, under the logic of *Grzeskiewicz*, an allegation that an insured gun owner negligently secured his gun collection could result in coverage where the insured's minor child retrieved a gun and accidentally killed a playmate, but could result in the denial of coverage where the insured's adult child retrieved a gun and intentionally killed an acquaintance. We find this result to be nonsensical.

¶ 26 Although they occur in the context of health and life insurance policies, and not general liability policies, we find the following cases also aid our determination. In *Mohn v. American Cas. Co. of Reading*, 458 Pa. 576, 326 A.2d 346 (1974), our Supreme Court held that "[i]n health and accident policies the law is now reasonably clear that the fact that the event causing the injury may be traceable to an intentional act of a third party does not preclude the occurrence from being an 'accident.'" *Id.* at 578, 326 A.2d at 348; *see also Roque v. Nationwide Mut. Ins. Co.*, 502 Pa. 615, 618, 467 A.2d 1128, 1129 (1983) (quoting *Mohn*). In *Mohn*, the insured's son was fatally wounded by a police officer while attempting to flee from the scene of a burglary he was committing. The insured brought an action under two medical insurance policies for reimbursement of his son's medical expenses. The policies provided coverage for expenses incurred as the result of an "injury" which was further defined as "accidental bodily injury which causes the loss directly and independently of all other causes." *Mohn*, 458 Pa. at 578, 326 A.2d at 347 (quoting policies). The Court, noting that "the test of whether injury is a result of an accident is to be determined from the viewpoint of the insured and not from the viewpoint of the one that committed the act causing the injury," *id.* at 578, 326 A.2d at 348; *see also Blackman v. Wright*, 716 A.2d 648, 651, n. 5 (Pa.Super.1998) ("our courts have held that the injury producing event must be viewed from the standpoint of the 'insured,'" citing *Mohn*), held that the "accidental bodily injury" language of the policy encompassed the injuries sustained by the insured's son during his flight from the police, *id.* at 586, 326 A.2d at 352. This case supports a conclusion that where, as here, the alleged negligence of an insured leads to an intentional act, such an act does not preclude a determination that the preceding negligence was an accident warranting coverage.

¶ 27 Accordingly, the main thrust of our Pennsylvania caselaw warrants a conclusion, and thus we hold, that negligence leading to intentional acts may nevertheless be considered an "accident," and thus an "occurrence" where so defined.[10] To the degree that *Grzeskiewicz* holds otherwise, it is now expressly disapproved. In addition, and in particular, we find that the instant Donegal policy provides coverage for the negligence of an insured even where that negligence leads to intentional acts of third parties or another insured.

---

10. We note that this result does not offend the public policy of this Commonwealth prohibiting insurance coverage for intentional acts, *see State Farm Mut. Auto. Ins. Co. v. Martin*, 442 Pa.Super. 442, 445, 660 A.2d 66, 68 (1995), as it is the negligent insured, not the intentional actor, who is covered.

¶ 28 We now examine the allegations contained in the underlying complaints filed by Plaintiffs in order to determine whether coverage is triggered under Donegal's policy. *See Mut. Benefit Ins. Co. v. Haver*, 555 Pa. 534, 538–39, 725 A.2d 743, 745 (1999) ("A carrier's duties to defend and indemnify an insured in a suit brought by a third party depend upon a determination of whether the third party's complaint triggers coverage."). In examining the factual allegations in those complaints, we find our Supreme Court's decision in *Mut. Benefit Ins. Co., supra*, to be particularly instructive. In that case, which involved a malpractice action instituted against a pharmacist, the factual averments in the underlying complaint established that the pharmacist acted intentionally rather than negligently. In holding that a malpractice insurance policy did not apply to the underlying lawsuit, our Supreme Court ruled that the *facts* contained in the underlying complaints must be examined to determine the existence of coverage and that averments of negligence which ring hollow under the recited facts cannot create coverage where none exists: "the particular cause of action that a complainant pleads is not determinative of whether coverage has been triggered. Instead, it is necessary to look at the factual allegations contained in the complaint." *Id.* at 538–39, 725 A.2d at 745. Our Supreme Court aptly observed, "to allow the manner in which the complainant frames the request for redress to control in a case such as this one would encourage litigation through the use of artful pleadings designed to avoid exclusions in liability insurance policies." *Id.; see also Kvaerner Metals, supra.*

¶ 29 In the instant case, Parents were alleged to have acted negligently, and this negligence is supported by numerous, specific, factual allegations, including that Parents should have taken possession of Baumhammers' gun or alerted authorities or mental health care providers about Baumhammers because they knew or should have known of his dangerous propensities and his possession of the gun. For the reasons discussed above, we find that Parents' alleged negligence, no less negligent because it is alleged to have led to Baumhammers' intentional attacks, can be considered an "accident" triggering an occurrence under the Donegal policy. Accordingly, we conclude there is coverage under the Donegal policy for the allegations of negligence against Parents, requiring Donegal's defense and potential indemnification.[11][12]

¶ 30 Finding coverage under the Donegal policy, we must next address the issue of the number of occurrences under that policy, in the event Donegal is required to indemnify Parents. The trial court concluded that there were six occurrences, one for each of the victims of Baumhammers' rampage.

¶ 31 The relevant section of the policy limited Donegal's liability as follows:

11. Donegal does not assert the application of any exclusions. *See supra* note 5.

12. While it does not affect this overall conclusion, we reject the trial court's determination that there is coverage under the Donegal policy on the basis that Plaintiffs averred in their respective complaints that Baumhammers shot his victims negligently rather than intentionally. (*See* Trial Court Opinion, 8/7/02, at 2 n.2 & 6.) Plaintiffs did not allege any facts to support those averments. Indeed, the complaints merely stated that Baumhammers "shot" his victims; there were no specific factual assertions demonstrating how the shootings could possibly be deemed accidental. Accordingly, we conclude that the trial court erred in finding there is coverage on this basis. *See Mut. Benefit Ins. Co.*, 555 Pa. at 539, 725 A.2d at 745.

**Limit of Liability.** Our total liability under Coverage E for all damages resulting from any one "occurrence" will not be more than the limit of liability for Coverage E as shown in the Declarations. This limit is the same regardless of the number of "insureds," claims made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence."

(Donegal Insurance Policy at 17 (R.R. 97a).) As we have already noted, the policy defines "occurrence" as an "accident."

¶ 32 Unsurprisingly, the parties assert different positions in this regard. Donegal, noting that Baumhammers' conduct resulted from the continuous and uninterrupted course of conduct of Parents—their alleged negligence—asserts that there is at most one occurrence, regardless of the number of Baumhammers' victims. (See Brief for Appellant Donegal at 21–30; Supplemental Brief on Reargument on Behalf of Appellant Donegal at 23–27.) By contrast, Parents assert there was one occurrence for each of Baumhammers' victims—six in all—relying primarily, as did the trial court, on *General Accident Ins. Co. of America v. Allen,* 708 A.2d 828 (Pa.Super.1998). (Substituted Brief on Reargument for Appellees and Cross-Appellants Andrejs Baumhammers and Inese Baumhammers at 40–43.) Plaintiffs also agree with the trial court's conclusion that there were six separate occurrences. (Supplemental Brief on Reargument of Underlying Plaintiffs at 6.)

¶ 33 Although they come to different conclusions, the parties herein appear to agree on the controlling analytical method for determining the number of occurrences—namely, the "cause of loss" or "cause" approach. Under this interpretive method, "an inquiry is directed into whether there was 'but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage.'" *Allen,* 708 A.2d at 833 (quoting *D'Auria v. Zurich Ins. Co.,* 352 Pa.Super. 231, 237, 507 A.2d 857, 860 (1986)); *see also Zimmerman v. Harleysville Mut. Ins. Co.,* 860 A.2d 167, 170–71 (Pa.Super.2004). Although our analysis differs, we ultimately agree with the trial court's conclusion that there were six occurrences, one for each victim. *See Shearer v. Naftzinger,* 560 Pa. 634, 638, 747 A.2d 859, 861 (2000) (noting that a lower court may be affirmed on any basis).

¶ 34 As we have noted, in reaching its conclusion that there were six occurrences under the Donegal policy, the trial court relied heavily on *Allen, supra.* In *Allen,* a husband and wife were sued in tort arising out of the sexual molestation of three minor children by the husband. Specifically, the wife was alleged to have negligently failed to prevent the abuse of the children by the husband. After concluding that the couple's homeowner's insurance provided coverage for the wife's allegedly negligent acts, but not the husband's intentional ones, we addressed the occurrence issue, and responded to the wife's contention that her ongoing negligence—what could be viewed as repeated acts of negligence—could result in multiple occurrences.

¶ 35 Applying the cause approach, and noting policy language that, as in the instant case, limited liability to damage resulting from "one accident or from continuous or repeated exposure to substantially the same general conditions shall be considered to be the result of one occurrence", *id.* at 833, this Court went on to state:

The allegations of negligence of Elizabeth Allen were all directed to a failure of Mrs. Allen to prevent the abuse at the

hands of her husband. Such failure persisted throughout the period of time the abuse occurred. Thus, at least as it relates to Mrs. Allen, the injury to the plaintiffs resulted from "continuous or repeated exposure to substantially the same general condition," *i.e.*, Mrs. Allen's negligent failure to prevent the sexual abuse, and, as such, was a single occurrence within the meaning of the policy. . . .

\* \* \*

. . . Since Elizabeth Allen was not alleged to have personally abused the children, her only causal contribution to the children['s] "bodily injury" was a result of her failure to prevent the abuse. This failure was ongoing throughout the period of abuse and, under a fair reading of the terms of the policy, constituted but a single occurrence.

*Id.* at 833–34. We found this conclusion to be consistent with *D'Auria, supra,* wherein we held that a doctor's alleged repeated failure to diagnose the plaintiff's urinary tract obstruction was but one occurrence: "to divide the doctor's mistreatment into multiple causes here would be an artificial and arbitrary division." *D'Auria,* 352 Pa.Super. at 238, 507 A.2d at 861.

¶ 36 Thus, the focus of the analysis in *Allen* was whether, with respect to any of the children, the wife's alleged ongoing negligence constituted one, or potentially multiple, occurrences, and we concluded that her negligence was no more than one occurrence; the focus was not whether multiple victims resulted in multiple occurrences.[13] Nevertheless, we added that the wife's "continuing failure to prevent the child abuse was a single occurrence *as to each child under the policy language.*" *Allen,* 708 A.2d at 834 (emphasis added). It is on this ultimate statement in *Allen* that Plaintiffs, Parents, and the trial court in this case rely. We question, however, whether the analysis in *Allen* encompasses such a broad conclusion, so we do not end our analysis there.

¶ 37 As we noted above, the "cause of loss" approach focuses on whether there is "one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage." *Allen,* 708 A.2d at 833 (internal quotation marks omitted). The problem with applying this approach in the instant case is that there are two proximate causes which resulted in Plaintiffs' claims: Baumhammers' attacks, and Parents' alleged negligence leading to the attacks.[14] Aside from *Allen, supra,* our

13. Indeed, we note that the cases cited in *Allen* either do not address the issue of multiple occurrences for multiple victims, *see D'Auria, supra; Lee v. Interstate Fire & Cas. Co.,* 826 F.Supp. 1156 (N.D.Ill.1993) (finding that negligence of a diocese in supervising one of its priests who sexually molested a young boy to be a single occurrence despite numerous instances of abuse), *rev'd,* 86 F.3d 101 (7th Cir.1996); *State Farm Fire and Cas. v. Elizabeth N.,* 9 Cal.App.4th 1232, 12 Cal. Rptr.2d 327 (1992) (insurer conceded that negligence leading to molestation of children was at least one occurrence per child), or find that there was only one occurrence despite multiple victims, *see Washoe County v. Transcontinental Ins. Co.,* 110 Nev. 798, 878 P.2d 306 (1994) (finding that the negligence of a

county in licensing and monitoring a day care center in which over forty children were sexually molested was but a single occurrence under its policy).

14. The issue of Parents' alleged negligence has yet to be litigated, and we express no opinion on it. Nevertheless, the number of occurrences under the Donegal policy is relevant only if Parents' are found to be liable, requiring Donegal to indemnify them. And, if Parents are to be found liable, their negligence must necessarily be found to be a proximate cause of the victims' harm. Thus, for the sake of our analysis *infra,* we assume their alleged negligence is a proximate cause of that harm.

research has located no reported decisions in this Commonwealth addressing this multiple cause situation, so we turn to other jurisdictions.

¶ 38 Based on our research, jurisdictions are split over whether, in analogous situations involving similar policy language, multiple victims, and multiple proximate causes, there is a finding of a single occurrence or multiple occurrences.[15] *See generally* Annotation, What Constitutes Single Accident or Occurrence Within Liability Policy Limiting Insurer's Liability to a Specified Amount Per Accident or Occurrence, 64 A.L.R.4th 668 (2005). Following our review, and for the reasons we discuss below, we are persuaded by the rationale of the courts that conclude there are multiple occurrences in such situations. We first discuss, however, the jurisdictions that find there is but one occurrence.

¶ 39 Generally, the decisions finding that there is one occurrence in such situations focus on the event which forms the basis for the insured's liability, not the more immediate cause of the harm, temporally.[16] Typical is *Washoe County v. Transcontinental Ins. Co.*, 110 Nev. 798, 878 P.2d 306 (1994). Therein, a county was alleged to be negligent in supervising day-care centers at which multiple children were molested. Applying the cause approach, and in concluding that despite the multiple victims, there was but one occurrence under the county's insurance policy, the Nevada Supreme Court focused on the basis of the insured's liability, not the immediate harmful act: "even though the actions of the individual wrongdoers are the most direct causes of harm for the victims ... the actions of the individual wrongdoers taken alone are not the basis of liability" for the county; "liability ... is premised on the entities' negligence in performing a duty, which permitted the intervening conduct of those who actively caused the victims' harm." *Id.* at 310. The court emphasized that "[i]n interpreting coverage for such entities under the 'causal' approach, 'occurrence' should be defined in such a way as to give meaning to the entity's connection to liability." *Id.*; *see also RLI Ins. Co. v. Simon's Rock Early College*, 54 Mass.App. Ct. 286, 765 N.E.2d 247, 251 (2002) (negligence of college in failing to prevent student from going on 18-minute shooting rampage was one occurrence, despite multiple victims: "We conclude that when the issue is the number of occurrences, we must look to the 'cause' of the injury by reference to the conduct of the insured for which coverage is afforded, and that 'cause' and 'occurrence' are indistinguishable for purposes of this analysis."); *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1383 (E.D.N.Y.1988) (applying New

---

**15.** The cases we discuss *infra* either explicitly apply the cause approach, or fail to mention which approach the court applies. Further, we have omitted from our discussion decisions in which the issue of the number of occurrences was apparently conceded by the insurer. *See, e.g., State Farm Fire and Cas. Co. v. Elizabeth N., supra.*

**16.** Although Donegal cites *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56 (3d Cir.1982), in support of its argument that there is only one occurrence herein, we find that case to be inapt because it does not address a multiple causation situation. In *Appalachian Ins. Co.*, an employer was sued by female employees who alleged that their company's employment policies discriminated against them. The court found that, despite numerous victims, there was but one occurrence under the company's liability policy. Unlike the situation herein, however, there were not intervening causes of the harm to the female employees: the harm resulted directly from the implementation of the discriminatory policy. We nonetheless recognize that that decision cogently sets forth the "cause of loss" approach which was ultimately adopted by this Court in *D'Auria, supra,* and *Allen, supra.*

York law) (delivery of agent orange to military constituted one occurrence despite multiple exposures to chemical: "Since the policy was intended to insure Uniroyal for its liabilities, the occurrence should be an event [the delivery of the chemicals] over which Uniroyal had some control. Otherwise, with the covered risks out of the insured's hands and coverage for losses determined by the acts of the unfettered armed forces, the insurer would have no basis for setting premiums *ex ante* and the insurance contract would be illusory.").

¶ 40 The courts concluding there is but one occurrence find that a liability-focused assessment of cause is most appropriate because, *inter alia,* it allows the insurer a basis for setting premiums, *see Uniroyal, Inc.,* 707 F.Supp. at 1383, and provides a meaningful limit on the insurer's liability, *see Travelers Indem. Co. v. Olive's Sporting Goods, Inc.,* 297 Ark. 516, 764 S.W.2d 596, 599 (1989) (finding negligence of sporting goods store for selling gun used to shoot several people constituted only one occurrence, noting, "[t]o decide that each of the injuries required separate coverage under the policy would in effect put a no-limit policy into effect"). Other cases similarly conclude that there is but one occurrence in these situations. *See Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co.,* 275 Kan. 698, 71 P.3d 1097 (2003) (despite 3800 hearing loss claims, insured's negligent failure to implement hearing conservation program was one occurrence); *Mead Reinsurance v. Granite State Ins. Co.,* 873 F.2d 1185 (9th Cir.1988) (city's liability for policy of condoning police misconduct resulted in one occurrence despite numerous police actions); *Home Indem. Co. v. City of Mobile,* 749 F.2d 659 (11th Cir.1984) (negligence of city in construction and maintaining water damage system resulted in one occurrence to property owners despite multiple rainstorms).

¶ 41 Conversely, the jurisdictions addressing situations where there are multiple proximate causes and concluding there are multiple occurrences focus on the most immediate cause of the harm, the cause that ultimately triggered the liability of the insured. *See generally Koikos v. Travelers Ins. Co.,* 849 So.2d 263 (Fla. 2003) (restaurant's negligence in failing to provide security, leading to shooting of several people, constitutes multiple occurrences, one for each victim); *S.F. v. West American Ins. Co.,* 250 Va. 461, 463 S.E.2d 450 (1995) (negligence in hiring, supervising, and retaining employee who molested infants constituted one occurrence per infant); *Soc'y of the Roman Catholic Church of the Diocese of Lafayette and Lake Charles, Inc. v. Interstate Fire & Cas. Co.,* 26 F.3d 1359 (5th Cir.1994) (applying Louisiana law) (negligence of diocese in failing to prevent molestation by priest of several children constituted multiple occurrences, one for each child); *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 150 F.3d 526 (5th Cir.1998) (applying Texas law) (negligence of employer leading to molestation of two children by employee constituted two occurrences, one for each child).

¶ 42 Under this view, "consistent with the 'cause theory,' ... when the insured is being sued for [negligence], 'occurrence' is defined by the immediate injury-producing act and not by the underlying tortious omission." *Koikos,* 849 So.2d at 271. This injury-producing act is an intervening cause which breaks the chain of causation allowing for more than one occurrence. *See H.E. Butt Grocery Co.,* 150 F.3d at 534 ("While 'a single occurrence may result in multiple injuries to multiple parties over a period of time ...[,] if one cause is interrupted and replaced by another intervening cause, the chain of causation is broken and more than one occurrence has taken

place.' " (quoting *Home Indem. Co. v. City of Mobile*, 749 F.2d at 662)).

¶ 43 The analysis in *Koikos, supra*, is particularly helpful as it deals with facts analogous to the instant case. Therein, a restaurant was sued for negligence in failing to provide security, which negligence allegedly led to the shooting of several people. The Florida Supreme Court appropriately noted that there were two possible causes for the resulting injury: "(1) the underlying tortious omission of the insured—Koikos's failure to provide security and failure to warn; or (2) the intervening intentional acts of the third party—the intruder's gunshots." *Id.* at 269. The court reasoned:

> The insured's alleged negligence is not the "occurrence"; the insured's alleged negligence is the basis upon which the insured is being sued by the injured party. Focusing on the immediate cause—that is the act that causes the damage—rather than the underlying tort—that is the insured's negligence— is also consistent with the interpretation of other forms of insurance policies. *See, e.g., Queen Ins. Co. v. Globe & Rutgers Fire Ins. Co.*, 263 U.S. 487, 492, 44 S.Ct. 175, 68 L.Ed. 402 (1924) ("[T]he common understanding is that in construing [marine insurance] policies we are not to take broad views but generally are to stop our inquiries with the cause nearest to the loss. This is a settled rule of construction, and if it is understood, does not deserve much criticism, since theoretically at least the parties can shape their contract as they like.").

> Finally, this approach is consistent with a reading of the various provisions of Travelers' policy in this case. Reading the relevant policy terms together, Travelers has entered into a contract with Koikos to pay those sums that Koikos becomes legally obligated to pay as damages because of "bodily injury," caused by an "occurrence" (i.e., an accident) that takes place in the coverage territory, during the policy period. The accident—the event that was neither expected nor intended from Koikos's standpoint—was the shooting incident and not Koikos's own failure to provide security. Although Koikos's alleged negligence in failing to provide security is the basis for which liability is sought to be imposed, it was the shooting that gave rise to the injuries that were neither expected nor intended from the insured's standpoint.

*Id.* at 271; *see also H.E. Butt Grocery Co.*, 150 F.3d at 534 ("Here, it is clear that each child's injuries are independent and caused by the separate acts of sexual abuse. We agree with the Ninth Circuit that 'the terms of the policy make clear that negligent supervision alone, whether ongoing or not, would not trigger any obligation on the part of the insurers. Rather it is the [ ] 'exposure' of the boy to the negligently supervised priest, resulting in injury, that provides the basis for indemnification.' ") (quoting *Interstate Fire & Cas. Co. v. Archdiocese of Portland in Oregon*, 35 F.3d 1325, 1329 (9th Cir.1994)); *H.E. Butt Grocery Co.*, 150 F.3d at 532 n. 5 (employer was "exposed to new liability for each separate and independent act of molestation on a new child").

¶ 44 It is this latter view which we find most persuasive. It is clear under the Donegal policy that Parents' alleged negligence alone did not trigger Donegal's policy obligations. It was not until their alleged negligence led to Baumhammers' shooting rampage that their liability, and thus Donegal's liability, was triggered. Parents' alleged negligence constituted the "accident" under the policy from their viewpoint, and "it was the shooting that

gave rise to the injuries that were neither expected nor intended" from Parents' standpoint. *Koikos*, 849 So.2d at 271.

¶ 45 Furthermore, we cannot conclude, as Donegal argues, that because the policy defines "continuous or repeated exposure to substantially the same general harmful conditions" as one occurrence, (Donegal Insurance Policy at 17 (R.R. 97a)), there was only one occurrence. As the court in *Koikos, supra,* noted, "[t]he victims were not "exposed" to the negligent failure to provide security. If the victims were "exposed" to anything, it was the bullets fired from the intruder's gun." *Koikos*, 849 So.2d at 268.

¶ 46 Finally, we note that it is clear that Parents were "exposed to new liability for each separate and independent act," *H.E. Butt Grocery Co.*, 150 F.3d at 532 n. 5, by Baumhammers: his independent acts of shooting each of his victims. Parents' allegedly negligent acts purportedly resulted in six distinct attacks on six individuals. Accordingly, we find that there were six occurrences under the Donegal policy.

### The USAA Policy

¶ 47 We now consider the propriety of the trial court's decision to enforce one of the exclusions contained in the USAA policy. These facts are relevant to our resolution of that question. The USAA umbrella policy purchased by Parents in 1988 provided that the policy applied to occurrences covered by the primary policy and contained no exclusions for that excess coverage. In the event that occurrences were not covered by the primary insurance, the 1988 policy provided basic coverage subject to several exclusions including injuries that were expected or intended by "an insured." In 1997, USAA issued a

new policy to Parents that did not distinguish between basic and excess coverage. It no longer provided coverage for all occurrences covered by the primary policy and instead contained its own definition of an occurrence. In addition, the policy also contained two separate exclusions. The first excluded coverage for bodily injury or damage caused by the intentional or purposeful act of "any insured," and the second excluded coverage for bodily injury or damage arising out of a criminal act of "any insured" whether or not such insured is convicted of a crime.[17]

¶ 48 The first page of the 1997 umbrella policy package that USAA sent to Parents contained the conspicuous heading "IMPORTANT MESSAGES." Under that heading, the policy stated, "Your Personal Umbrella Policy contract has been revised. Please refer to the attached 'Notice of Policy Changes' . . . for more information about how the revision affects your coverage." (1997 USAA Insurance Policy (Exhibit D to Andrejs Baumhammers' and Inese Baumhammers' Brief in Opposition to Motion for Reconsideration of Donegal Mutual Insurance Company) at 1 (R.R. 522a).) The attached "Notice of Policy Changes" stated in relevant part: "THIS NOTICE DESCRIBES CHANGES IN YOUR PERSONAL UMBRELLA POLICY. PLEASE READ IT CAREFULLY. SOME OF THESE CHANGES INVOLVE REDUCTION IN COVERAGE." (*Id.* at 13 (R.R. 534a).) The "Notice of Policy Changes" also listed coverage changes and the page of the policy where the changed language was located. Among the coverage changes listed specifically in the "Notice of Policy Changes" was that a definition of "occurrence" was added and that "liability arising out of malicious

---

17. While the trial court analyzed only the criminal acts exclusion, the analysis of the criminal acts and intentional acts exclusions are related, and we conclude below that both apply.

and/or criminal acts is now specifically excluded." [18]  (*Id.* at 14–15 (R.R. 535a–36a).)

¶ 49 We first address Parents' challenges to enforcement of the exclusion pertaining to "[b]odily injury, personal injury or property damage arising out of a malicious or criminal act or omission by, or with either the knowledge or consent of, *any* insured regardless of whether such insured is actually charged with, or convicted of, a crime." (USAA Insurance Policy at 3 (R.R. 73a) (emphasis added).)

¶ 50 When interpreting an insurance contract, words that are clear and unambiguous must be given their plain and ordinary meaning. *Brosovic v. Nationwide Mut. Ins. Co.,* 841 A.2d 1071, 1073 (Pa.Super.2004). As we noted above, an ambiguity exists where a policy provision is "subject to more than one reasonable interpretation when applied to a particular set of facts." *Madison Constr. Co.,* 557 Pa. at 606, 735 A.2d at 106. Generally, "courts should try to read policy provisions to avoid ambiguities, if possible, and not torture language to create them." *Brosovic,* 841 A.2d at 1073 (internal quotation marks omitted). When the wording of an exclusion is clear, we will enforce it. *See Donegal Mut. Ins. Co. v. Fackler,* 835 A.2d 712, 717 (Pa.Super.2003).

¶ 51 Parents claim the exclusion only bars coverage for Baumhammers since he alone committed the underlying criminal acts. In support of this argument, Parents rely upon *Board of Public Education, supra.* As noted, the school board in that case was sued under a negligence theory by a child who had been abused by a

volunteer in a school organization. We concluded that the allegations of negligence triggered coverage under the relevant policy, but then determined whether an exclusion for claims involving criminal acts or assault or battery applied.

¶ 52 Upon review, we determined that, in the absence of clear language requiring such a result, we would not read the exclusions to bar coverage for a claim related to the negligence of an insured even though that negligence may have resulted in criminal or assaultive behavior perpetrated by another party insured under the same policy. *Board of Public Education,* 709 A.2d at 914–17. Since the policy was not clear on this point, and because the school board's actions were not alleged to be criminal or assaultive, we concluded that the exclusion did not apply. *Id.*

¶ 53 Parents' reliance on *Board of Public Education* in this respect is misplaced because the exclusion in this case is clear. The fact that Parents did not engage in criminal behavior is immaterial because the USAA policy exclusion applies to criminal behavior of *any* insured. Since Baumhammers is an insured and the underlying claims do not contain sufficient, exact averments establishing how Baumhammers' actions were not intentional and were not criminal, the exclusion applies. In light of the clear and unambiguous wording of the present exclusion, which bears little resemblance to the exclusion considered in *Board of Public Education,* we will not hesitate to enforce it. *Cf. McAllister v. Millville Mut. Ins. Co.,* 433 Pa.Super. 330, 640 A.2d 1283 (1994) (exclusions in fire

---

18. In light of these facts, we cannot accept Plaintiffs' assertion that "USAA did not tell or explain" to Parents that the 1997 policy "changed their coverage." (Brief on Reargument of Underlying Plaintiffs as Appellants and as Appellees to Appeal filed by USAA at 12.) Since this notice also specifically instructed Parents to read the exclusion and told them that the changed policy excluded liability arising from criminal acts, we reject the position that USAA "took no affirmative steps to ensure that the Baumhammers *understood* the unilateral changes." *Id.* (emphasis original).

insurance policy indicating that no coverage was provided when loss was result of neglect by "any" insured or intentional act by "an" insured, precluded recovery by insured who did not set fire because another insured intentionally set fire). Hence, Parents' argument is unavailing.

¶ 54 Parents further assert that the intentional and criminal acts exclusions deny coverage that would otherwise be available under the general insuring language of the policy wherein USAA promises that "We will pay for damages *an insured* becomes legally obligated to pay" for occurrences not excluded. (USAA Insurance Policy at 2 (R.R. 72a) (emphasis added).) Parents explain:

> By focusing on the singular, "an" insured, USAA leads any reasonable insured to believe that the policy is intended to apply separately to each insured in terms of coverage. The exclusion of coverage for "an" insured who is negligent when another insured commits a criminal act cannot be what the parties bargained for.

(Substituted Brief on Reargument for Appellees and Cross–Appellants Andrejs Baumhammers and Inese Baumhammers at 31.) Parents suggest that, as a result, the exclusionary language is, at least, ambiguous.

¶ 55 We disagree. The fact that the exclusion applies to behavior that may otherwise be covered as an occurrence does not render the provisions of the exclusion ambiguous. Exclusions, by their very nature, are designed to operate to deny coverage that otherwise would be provided under the definition of an occurrence.

¶ 56 Moreover, we reject Parents' contention that enforcement of the exclusions defeats their reasonable expectation that their non-criminal, negligent behavior would be covered by the USAA policy. As this Court has previously stated,

The proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured. In determining the reasonable expectations of the insured, courts must examine the totality of the insurance transaction involved. However, while reasonable expectations of the insured are the focal points in interpreting the contract language of insurance policies, an insured may not complain that his or her reasonable expectations were frustrated by policy limitations which are clear and unambiguous.

*McAllister,* 640 A.2d at 1288 (citations omitted); *see also Kundahl v. Erie Ins. Group,* 703 A.2d 542, 544–45 (Pa.Super.1997).

¶ 57 In the present case, the criminal act exclusion clearly states that the insurance policy does not apply to bodily or personal injury arising out of a malicious or criminal act of any insured whether or not such insured is convicted of a crime. Similarly, coverage is excluded for bodily or personal injury caused by the intentional or purposeful act of any insured. The bodily and personal injuries suffered by Plaintiffs arose from the intentional, malicious, and criminal acts of an insured, Richard Baumhammers. The underlying complaints do not contain any in-depth factual assertions establishing that Baumhammers acted otherwise. As such, the exclusions apply. Furthermore, Parents cannot claim they reasonably expected that criminal conduct and intentional conduct would be covered because the exclusions clearly and unambiguously state that criminal conduct and intentional conduct by any insured is not covered under the policy.

¶ 58 Parents also contend that the exclusions are void because USAA failed to show both that it advised Parents of the changes it made to the policy in 1997 and

that Parents understood the changes. Parents rely upon *Tonkovic v. State Farm Mut. Auto. Ins. Co.*, 513 Pa. 445, 521 A.2d 920 (1987). In *Tonkovic*, the issue was whether a jury's conclusion that an insured was not notified of an exclusion was based on sufficient evidence. Therein, the insured purchased disability insurance from an insurance agent, but was never informed that he would not receive disability insurance if he was injured at work and received workers' compensation benefits. When the insured was denied disability coverage upon receipt of workers' compensation benefits, he instituted an action against the insurer for disability benefits. He contended that he had purchased disability insurance specifically for mortgage coverage, which the agent acknowledged, and that he expected disability benefits in the event of a work-related injury. When the policy was issued, the insurer unilaterally and without notice inserted an exclusion for workplace injuries that were covered by workers' compensation. The insured claimed that the exclusion was neither shown nor explained to him.

¶ 59 The *Tonkovic* Court held that the jury's verdict was supported by sufficient evidence. It ruled that when an insured purchases specific coverage, that coverage may not be changed unilaterally by the insurer "without an affirmative showing that the insured was notified of, and understood, the change." *Id.* at 455, 521 A.2d at 925.

¶ 60 In the present case, Parents were informed of the insertion of the criminal act and intentional act exclusions in a written notice in the policy itself. Specifically, Parents were told in conspicuous, capital lettering that there were changes in the 1997 policy involving a reduction in coverage. (1997 USAA Insurance Policy at 13 (R.R. 534a).) Parents were instructed to read the changes carefully. A separate sheet, entitled "Notice of Policy Changes," informed Parents that "[l]iability arising out of malicious and/or criminal acts is now specifically excluded." (*Id.* at 15 (R.R. 536a).) They were directed to where the relevant exclusion appeared in the policy, and the exclusions were clearly phrased.

¶ 61 In light of the facts herein, we conclude that the seminal decision in *Standard Venetian Blind Co. v. American Empire Ins. Co., supra,* is controlling. The issue in *Standard Venetian Blind Co.* was whether the insured under a liability policy could avoid a clear and unambiguous exclusion because the insured alleged that it was not made aware of and did not understand the effect of the exclusion. Our Supreme Court held that the insured's purported lack of knowledge or understanding of the clear exclusion did not render the clause unenforceable. The Court stated:

> The principles governing our interpretation of a contract of insurance are familiar and well settled. The task of interpreting a contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language. "[I]n the absence of proof of fraud, 'failure to read [the contract] is an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of the contract or any provision thereof.'"

*Id.* at 304–05, 469 A.2d at 566 (citations omitted). The Court held that when "the policy limitation relied upon by the insurer to deny coverage is clearly worded and conspicuously displayed, the insured may not avoid the consequences of that limitation by proof that he failed to read the limitation or that he did not understand it." *Id.* at 307, 469 A.2d at 566.

¶ 62 In this case, as we noted, Parents were notified in conspicuous lettering that their policy had been changed, that the changes should be read carefully, and that the changes involved a reduction in coverage. In addition, Parents were informed separately in the "Notice of Policy Changes" about the exclusion for criminal acts. Accordingly, USAA has established that Parents were notified of the changes and that the changes reduced coverage; hence *Tonkovic* does not afford Parents any relief.

¶ 63 We also disagree with the assertion that the 1997 language notifying Parents of the changes in the USAA policy was "not readily apparent to a layperson not familiar with insurance terminology." (Brief on Reargument of Underlying Plaintiffs as Appellants and as Appellees to Appeal filed by USAA at 17.) The language was not technical, did not involve any obscure insurance terms, and was capable of being understood by the average person. Thus, Parents cannot claim to have misunderstood its language. *See Standard Venetian Blind Co., supra.*

¶ 64 Parents' final argument is that the exclusions are void as against public policy. We disagree. We have routinely upheld language in general liability insurance policies that operated to deny coverage for criminal acts. *See Erie Ins. Exch. v. Fidler,* 808 A.2d 587, 591 (Pa.Super.2002); *Germantown Ins. Co. v. Martin,* 407 Pa.Super. 326, 333, 595 A.2d 1172, 1175 (Pa.Super.1991).

¶ 65 Plaintiffs raise some of the same challenges to the trial court's ruling that we have already rejected. Specifically, they contend that Parents did not understand the exclusions, that the exclusions are ambiguous, that the clauses cannot be enforced because they defeat Parents' reasonable expectations, that the exclusions conflict with the definition of occurrence, and that public policy requires that coverage be upheld. All of these arguments have been considered and dismissed.

¶ 66 However, Plaintiffs raise two additional claims. They first suggest that Parents and Plaintiffs should not be precluded "from raising the issue of [Baumhammers] lacking the mental capacity to commit intentional harm as it applies to insurance coverage and subsequent civil proceedings." (Brief on Reargument of Underlying Plaintiffs as Appellants and as Appellees to Appeal filed by USAA at 38.)

¶ 67 We reject this contention and conclude that our decision in *Germantown Ins. Co. v. Martin, supra,* is controlling. In that case, the insured shot three people, killing two and seriously wounding the third, and then shot himself. The victims instituted an action against the shooter's estate, alleging that the shooter negligently or unintentionally shot his three victims. Coverage was sought under a homeowner's policy that excluded coverage for bodily injury which was expected or intended by the insured. The trial court determined that the shooter was acting under an "irrational impulse" at the time and therefore committed the shootings unintentionally.

¶ 68 We reversed and ruled specifically that the question of the shooter's rationality was not relevant to the application of an intentional acts exclusion. *Germantown Ins. Co.,* 407 Pa.Super. at 333–34, 595 A.2d at 1175–76. Looking at the events that transpired on the day in question, we con-

cluded that the shooter's actions were intentional, adding that the fact that the:

> acts were senseless, irrational and incomprehensible to the trial court or anyone else has no bearing on determining coverage under the policy. The record before us discloses [the shooter] brought about the harm he intended. Obviously, no rational person would go on a shooting spree, but this in no way lessens the intentional character of the conduct, if such intent is evidenced.

*Id.* at 333–34, 595 A.2d at 1176. We also agreed with the insurer's position that any "psychiatric testimony in this case appears to be irrelevant to the issue of coverage." *Id.* at 334, 595 A.2d at 1176.

¶ 69 Plaintiffs' reliance upon *Stidham v. Millvale Sportsmen's Club*, 421 Pa.Super. 548, 618 A.2d 945 (1992), is unavailing, as that case is distinguishable. Therein, the shooter was in an alcoholic stupor when he shot his victim and had no conscious awareness of his actions and no memory of the tragic events. In connection with his criminal prosecution for the shooting, he pled guilty to third-degree murder, but denied on the record that he had intended to kill the victim.

¶ 70 In the subsequent declaratory judgment action where the victim sought coverage from the shooter's homeowner's policy, the trial court ruled that the shooter was collaterally estopped from denying the intentional nature of his acts due to the entry of his guilty plea. Accordingly, the trial court granted summary judgment to the insurer based on an insurance clause excluding coverage for harm intended or expected by the insured. We reversed and ruled that, in light of the shooter's denial of intentional conduct at the guilty plea and in light of the fact that the shooter's consumption of alcohol resulted in a total lack of consciousness regarding the events, the policy exclusion did not apply. *Id.* at 563–68, 618 A.2d at 953–955.

¶ 71 In the present case, the USAA insurance policy contains both an intentional act exclusion, excluding coverage for the intentional act of any insured, and a criminal act exclusion. The underlying complaints fail to contain any indication that Baumhammers' actions lacked conscious awareness; unlike the insured in *Stidham*, Baumhammers did not consume alcohol to the point that he suffered an alcoholic blackout. Moreover, Baumhammers' acts were unarguably criminal in nature.

¶ 72 When we are applying the language of an exclusion, the allegations in the underlying complaint determine whether coverage is triggered. *Aetna Cas. and Sur. Co. v. Roe*, 437 Pa.Super. 414, 422, 650 A.2d 94, 98–99 (1994); *United Serv. Auto. Ass'n v. Elitzky*, 358 Pa.Super. 362, 368, 517 A.2d 982, 985 (1986). In determining whether an actor intends his harm, we utilize the definition set forth in Restatement (Second) of Torts § 8A. *Elitzky*, 358 Pa.Super. at 369, 517 A.2d at 986. That provision states: "The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." Rest. (Second) Torts § 8A. Thus, an insured intends an injury if he wanted to cause the consequences of his act or acted knowing that those consequences were substantially certain to result. *Elitzky*, 358 Pa.Super. at 369, 517 A.2d at 986.

¶ 73 In this case, the complaints contain averments that Baumhammers' actions were unintentional. However, as stated above, we do not look at legal conclusions to determine coverage but must look at the specific factual allegations. *See Mut. Benefit Ins. Co. v. Haver, supra.*

The only averments contained in the underlying complaints are that each individual plaintiff was shot by Baumhammers. There are no specific facts set forth in those complaints supporting the allegation that any of the shootings was unintentional. In the absence of facts contradicting what human experience teaches are volitional acts, the shootings indicate that Baumhammers sought to cause the harm that he inflicted and, therefore, acted intentionally. An "actor is presumed to intend the natural and probable consequences of his actions," *Commonwealth v. Sirianni*, 286 Pa.Super. 176, 183 n. 7, 428 A.2d 629, 633 n. 7 (1981) (citing Rest. (Second) of Torts § 8A), and serious bodily injury or death is the "natural and probable result" of pointing a loaded gun at a person and firing that weapon. *Id.* Thus, we conclude coverage was not triggered and an evidentiary hearing is not warranted. *See Minnesota Fire and Cas. Co. v. Greenfield, supra* (insured acted intentionally in supplying heroin which resulted in death of victim, and, based on intentional act exclusion, insurer had no duty to defend or indemnify insured in underlying action for wrongful death of heroin user); *Aetna Cas. and Sur. Co. v. Roe, supra* (where underlying complaints indicated that insureds sexually and physically abused plaintiffs, exclusion for intended or expected harm applied and insurer had no duty to defend insureds in underlying action). Moreover, as discussed earlier, under *Germantown Ins. Co. v. Martin, supra*, psychiatric testimony may not be used to suggest that Baumhammers' acts were unintentional.

¶ 74 We next address the parties' dispute regarding the application of collateral estoppel principles to Baumhammers' underlying criminal conviction with respect to the exclusions in the USAA policy. (*See* Brief on Reargument of Underlying Plaintiffs as Appellants and as Appellees to Appeal filed by USAA at 37–40; Refiled Brief of USAA as Cross–Appellant at 18–26.) The trial court found that collateral estoppel did not apply because Parents were not parties to Baumhammers' criminal proceedings. (*See* Trial Court Opinion, 8/7/02, at 17 n.7.) However, we find the use of such an analysis unnecessary to properly resolve the question raised. We need not give collateral estoppel effect to the criminal convictions in order to establish that these exclusions apply. The exclusions state that insurance is not provided for criminal acts or intentional acts of "any insured," whether or not criminal convictions result. Baumhammers, an insured, committed intentional and criminal acts, and those acts form the basis for the requested coverage. Hence, the exclusions apply. Our decision flows from the language of the policy itself as well as the facts surrounding the shootings and not from a collateral estoppel application of Baumhammers' criminal convictions.

■ ¶ 75 Finally, Plaintiffs raise one additional and novel argument. They contend that since the umbrella policy was purchased to provide excess coverage to the Donegal policy, the policy must be construed to apply excess coverage in any situation where the Donegal policy provides coverage. Specifically, they assert that because the intentional acts exclusion in the USAA policy does not conform to the intentional acts exclusion in the Donegal policy, the USAA policy exclusion cannot be enforced. (*See* Brief on Reargument of Underlying Plaintiffs as Appellants and as Appellees to Appeal filed by USAA at 17–24.) Plaintiffs, however, have failed to cite any caselaw suggesting that the coverage of an excess carrier must be coextensive with that of the primary carrier. Indeed, the coverages herein are provided by different companies under different policies.

Moreover, we have concluded that there is no coverage under the USAA policy on the additional basis that the criminal acts exclusion applies, for which there is no comparable exclusion in the Donegal policy.

¶ 76 Plaintiffs also assert that any conclusion that the USAA policy provides different coverage from the Donegal policy violates the reasonable expectations of Parents that, while excess, the coverages were otherwise coextensive. As we have said, however, we will not find that the reasonable expectations of an insured are violated in the face of otherwise clear and unambiguous policy language. *See McAllister,* 640 A.2d at 1288.[19]

¶ 77 In light of the foregoing, we affirm the order of the trial court finding coverage as to Donegal and precluding coverage as to USAA.

¶ 78 Order **AFFIRMED.**

¶ 79 DEL SOLE, PJ, STEVENS, MUSMANNO, McCAFFERY and PANELLA JJ join in the majority decision.

¶ 80 LALLY–GREEN, J. files a concurring and dissenting opinion in which FORD ELLIOTT, J. joins and ORIE MELVIN, J. concurs in the result.

**CONCURRING AND DISSENTING OPINION BY LALLY–GREEN, J.:**

¶ 1 Our esteemed colleague, Judge Todd, has, in her usual fashion, conducted a thorough and scholarly review of the difficult issues in this case.

¶ 2 To begin, I join the result and reasoning of the Majority's Opinion with respect to Issue 1.[20] Specifically, I agree that the Donegal policy provides coverage to Parents. As the Majority aptly states, "Parents' alleged negligence, no less negligent because it is alleged to have led to Baumhammer's intentional attacks, can be considered an 'accident' triggering an occurrence under the Donegal policy." Majority Opinion at 811. The Majority correctly focuses on the standpoint of the insured, not the standpoint of the victims, when determining that an accident has occurred.

¶ 3 I am compelled respectfully to dissent, however, from the Majority's determination in Issue 2 that six "occurrences" took place under the policy. The Majority comes to this conclusion by adopting the "immediate cause" or "damaging act" approach set forth in *Koikos v. Travelers Ins. Co.,* 849 So.2d 263 (Fla.2003).[21] The

---

**19.** Given our conclusion that the USAA policy does not provide coverage, we need not address USAA's contention in its cross-appeal that the trial court improperly determined the number of occurrences presented by the events.

**20.** I also join the Majority's Opinion in full with respect to Issue 3, regarding the USAA policy.

**21.** Under this approach, the focus is on whether an intervening act (*e.g.,* a criminal shooting spree) was the "act that caused the damage." This approach seems to be based on a broad view of an "accident" as any event which causes harm to another and which is neither expected nor intended from the point

of view of the insured. *Koikos,* 849 So.2d at 271. Under the Majority's logic, since all six shootings separately caused harm and none of them was expected nor intended by the insured, there were six "occurrences."

In my view, the Majority's approach improperly focuses on the number of victims and/or the specific instrumentality chosen by Richard Baumhammers, instead of the negligent act of the insured. Under the "liability" approach (adopted by the Majority in Issue 1), there is only one occurrence under the facts of the case because there is one act of negligence. Said another way, from the point of view of the insured parents, the Donegal policy provided coverage for the parents' negligence and not Richard's intentional criminal acts.

Majority rejects the "liability" approach, which focuses on the negligent act of the insured.

¶ 4 In my view, the "liability" approach is the more logical approach for cases such as this. Indeed, the Appellate Division of the New Jersey Superior Court recently adopted the reasoning behind the "liability" approach in a case strikingly similar to the instant case. *Bomba v. State Farm Fire & Cas. Co.*, 379 N.J.Super. 589, 879 A.2d 1252 (App.Div.2005). In that case, a young man who lived with his parents left the home with a shotgun and injured two police officers on a city street. The officers filed suit against the parents, contending that the parents "negligently maintained firearms in their home, negligently supervised their son, and negligently entrusted the firearms to him." *Id.* at 1253. The parents held a homeowners' policy which, like the instant policy, provided coverage for an "occurrence," which was defined as an "accident."

¶ 5 As in the instant case, the question became whether there was one "occurrence" or multiple "occurrences" for coverage purposes. The *Bomba* Court held that there was one "occurrence." The Court began by analogizing the case to a New Jersey case called *Doria v. Insurance Co. of North America*, 210 N.J.Super. 67, 69, 73–74, 509 A.2d 220 (App.Div.1986), where one boy drowned in a swimming pool, and a second boy died while trying to save the first. The Court noted that in *Doria*, even though there was more than one victim, there was only one "occurrence" because those injuries "are so closely linked in time and space as to be deemed by the average person as a single event[.]" *Bomba*, 879 A.2d at 1255.

¶ 6 Next, the *Bomba* Court **rejected** the position that the shooter's intentional act constituted an intervening cause, thus triggering multiple "occurrences" for coverage purposes. In other words, the Court rejected the "immediate cause" or "harmful act" approach. The Court wrote:

We cannot avoid observing that plaintiffs' assertions about the cause of the injuries are based on a fundamental misunderstanding of the coverage analysis. Simply put, in the absence of a covered event, there can be no recovery under the policy at all. In this regard, we note that plaintiffs' complaint against the gunman's parents appropriately focused solely on their asserted acts of negligence rather than on the gunman's acts. That pleading recognized that for coverage purposes the alleged negligence of the homeowner is the appropriate focus. Indeed, as the Law Division judge noted, if the action of the gunman, who repeatedly aimed and fired at the two police officers, is the cause of the injuries, then the officers' claims would not be covered under the policy, but would fail by virtue of the policy's exclusion for intentional or criminal acts. The Law Division judge aptly described this as an intervening uncovered act which, if it were the cause, would result in a loss of coverage. As the judge recognized, **the only act that would support coverage for these claims is the negligent act of the insureds, namely, their failure to safely maintain the weapons and their failure to properly supervise their adult son which led to his criminal act of shooting the two officers.**

*Id.* at 1255–1256 (emphasis added).[22]

¶ 7 I would conclude that *Bomba* is factually on point, and that its reasoning on

---

**22.** The *Bomba* Court then cited with approval the cases of *RLI Ins. Co. v. Simon's Rock Early College*, 54 Mass.App.Ct. 286, 765

N.E.2d 247, 251 (2002), and *Travelers Indem. Co. v. Olive's Sporting Goods, Inc.*, 297 Ark. 516, 764 S.W.2d 596, 599 (1989), adopting

the "liability" approach is quite persuasive. The only covered event was an act of negligence. Parents, the insureds, allegedly let their son Richard out of the house with a gun on **one** fateful occasion. From the Parents' standpoint, this is one alleged act of negligence, one accident, and one occurrence. This is a logical result, quite consistent with the Majority's sound disposition of Issue 1.

¶ 8 Furthermore, from a public policy standpoint, I agree with the reasoning of the cases described in detail at pages 814–15 of the Majority's Opinion. Without repeating that rationale in detail, I point specifically to the Majority's persuasive statement that "a liability-focused assessment of cause is most appropriate because, *inter alia,* it allows the insurer a basis for setting premiums and provides a meaningful limit on the insurer's liability." *Id.* at 815 (citations omitted).

¶ 9 To summarize, a liability-focused assessment of cause is most consistent with the reasonable expectations of the insured, and with predictable insurance practices. Moreover, it is the approach which is most consistent with the plain language of the policy itself. Again, the policy states, in relevant part:

> **Limit of Liability.** Our total coverage under Coverage E for all damages resulting from any one "occurrence" will not be more than the limit of liability for Coverage E as shown in the Declarations [*i.e.,* $300,000.00]. **This limit is the same regardless of the number of "insureds," claims made or persons injured. All "bodily injury" and "property damage" resulting from any**

one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence."

Majority Opinion at 812, *quoting,* Donegal Insurance Policy at 17 (emphasis added). In my view, this unambiguous language demonstrates an intent to focus on the insureds' underlying liability, rather than the most-proximate "damaging act" or the number of victims.[23]

¶ 10 I understand that under this reasoning, Plaintiffs and Parents would have $300,000.00 of insurance coverage potentially available to them, rather than $1.8 million. While I have huge sympathy for the victims of this most tragic case, the conclusion I suggest derives from the relevant case law, the public policy, and the insurance contract itself. Accordingly, I concur in part and dissent in part.

¶ 11 FORD–ELLIOTT, J. joins. ORIE MELVIN, J. concurs in the result.

---

the "liability" approach. The Majority cites these cases in its discussion of the "liability" approach.

**23.** I note that in many automobile insurance policies, insurers provide separate limits of coverage "per accident," and "per person" injured. In stark contrast, the Donegal policy provides coverage solely on a "per accident" basis and not on a "per person" basis.