# RLI Insurance Company *vs.* Simon's Rock Early College & others.[1]

No. 97-P-801.

Essex. February 7, 2001. - March 22, 2002.

Present: Jacobs, Duffly, & Cypher, JJ.

*Contract,* Insurance. *Insurance,* General liability insurance, Excess liability insurance, Construction of policy, Coverage. *Negligence,* College. *Words,* "Occurrence," "Cause."

In a civil action regarding a dispute between the primary and excess liability insurers of a college as to the amount of coverage available under the college's primary general liability policy for claims arising from a shooting rampage by a student of the college, the conduct of the insured (i.e., the college's allegedly negligent acts or omissions in failing to prevent the shooting), and not the intentional acts of the shooter, constituted the "cause" of injury for the purposes of determining the "per occurrence" liability of the primary insurer [289-293]; where the record demonstrated that the acts and omissions on the part of the college were not discrete acts so separated by time and location as to result in separate injuries, but rather combined to create an arguably inadequate policy of security and student supervision, the college's conduct constituted a single occurrence for insurance coverage purposes [293-296].

Civil action commenced in the Superior Court Department on July 29, 1994.

The case was heard by *Peter F. Brady*, J., on motions for summary judgment.

*Eugene G. Coombs, Jr.*, for the plaintiff.

*Bruce G. von Rosenvinge* for American Alliance Insurance Company.

---

[1]Bard College; American Alliance Insurance Company; Bernard Rodgers; Ba Win; Judith Win; Floyd Robinson; Trinka Robinson; Gregory Gibson, individually and as he is administrator of the estate of Galen Gibson; Anne Marie Crotty; James E. Farrell, Jr., administrator of the estate of Nacunan L. Saez; Donald N. David, individually and as he is guardian of Matthew David; Matthew David; and Evalyn David.

DUFFLY, J. This case involves a dispute between the primary and excess liability insurers of Simon's Rock Early College, also known as Simon's Rock College of Bard (college), as to the amount of coverage available under the college's primary policy for claims arising from a 1992 shooting rampage by a student of the college. On cross motions for summary judgment, a judge of the Superior Court allowed the motion of the primary insurer, American Alliance Insurance Company (American), denied RLI Insurance Company's (RLI's) motion, and made a declaration that all claims arising from the shooting rampage arose out of a single occurrence; that American's policy with respect to the underlying claims would be exhausted upon payment of its $1 million per occurrence limit; and that RLI's obligation to pay would begin upon exhaustion of American's per occurrence limit. The effect of the judgment was to increase RLI's exposure under its excess policy of insurance. RLI appealed. The crux of this dispute is whether there were multiple "occurrences" under the American policy, requiring American to pay its aggregate policy limit of $3 million. We affirm the judgment, but because our analysis differs from that of the Superior Court judge, we set forth our reasoning following a summary of the undisputed facts.

*Facts.* On December 14, 1992, Wayne Lo, a student at the college, went on a shooting spree that lasted eighteen minutes, spanned approximately a quarter of a mile, and resulted in the killing of two and the injuring of four individuals.

The events of the day began at approximately 10:00 A.M., when a receptionist at the college took delivery of a package addressed to Lo that bore the return address of an arms store. She advised certain of the college's residence directors of the package, and they brought it with them to a regularly scheduled meeting with Bernard Rodgers, a dean of the college. There was discussion of the package at the meeting, which lasted about an hour and included discussion of other business. Concern was expressed over the return address, "Classic Arms" in North Carolina, and that the package might contain a weapon in violation of the college policy prohibiting firearms, weapons, and explosives on college property. Dean Rodgers and the residence directors' decided to allow the package to be delivered

to Lo, and that once received by him a prompt inquiry would be undertaken to determine the package contents. Following the meeting, the package was returned to the package room, where it was picked up by Lo a short time later.

Katherine "Trinka" Robinson, one of the residence directors, learned that Lo had picked up the package and followed him back to his dormitory room, where he opened the door to her knock. She saw the unopened package and requested that Lo show her its contents. Lo refused, relying on college policy requiring that permission to search be obtained from the associate dean of students, and that the search be in the presence of at least one other college staff member. Robinson left and called Dean Rodgers from her apartment. He directed her to return to Lo's room to determine the package contents. Accompanied by her husband, Floyd Robinson, also a residence director, Katherine Robinson returned to Lo's room and, when he opened the door, observed three or four apparently empty black plastic magazines, a black plastic rifle stock, and an empty metallic army surplus cartridge box, but no ammunition or gun. Lo explained that the cartridge box was a gift for his father, and the other items were for his own use at home in Montana, where he had a semiautomatic rifle that he used for target practice. Lo gave this same explanation to Dean Rodgers who, after Katherine Robinson called to describe what she had observed in Lo's room, requested that Lo come immediately to the dean's office. When Lo arrived at the dean's office with the items, he appeared to be calm and was not defensive as he expressed to the dean his understanding of the college's policy that no firearms were permitted on campus.

Later that day, Lo traveled by taxi to a Pittsfield sporting goods store where he purchased an assault rifle. That evening, sometime after 9:00 P.M., as Lo was attending a house council meeting with Floyd Robinson and other students, Katherine Robinson received a telephone call at her home. The caller, who refused at the time to identify himself, stated that Lo had a gun and live ammunition and was going to kill the members of the Robinson family and others the following night. The caller was another student with whom Lo had just had dinner, during which Lo performed a mock "Last Supper" and indicated he was go-

ing to kill. The Robinsons contacted the college provost, Ba Win, and at his urging went with their children to the Win home. There they called Dean Rodgers to convey a plan to locate Lo and search his room for weapons. As they spoke, they heard shots being fired nearby that turned out to be the opening salvo in the unfolding tragedy.

Some of the individuals who were wounded, their families, and families of the deceased brought suit against the college, in essence alleging that it was negligent in failing to prevent Lo from engaging in the wrongful acts that resulted in their damages. RLI filed a complaint seeking a declaration that the coverage available for all of the underlying tort clams under American's policy of insurance was the aggregate limit of $3 million. American's counterclaim sought a declaration that coverage under its policy would be exhausted upon the payment of its per occurrence limit of $1 million.

*Discussion:* The parties contend that in Massachusetts, as in the majority of jurisdictions having decided the issue, the number of occurrences is determined by the "cause" theory, which construes occurrence "by reference to the cause or causes of the injury or damage rather than the number of claims." *Doria* v. *Insurance Co. of N. America,* 210 N.J. Super. 67, 73-74 (1986) (citing cases; Annot., 55 A.L.R.2d 1300, 1303 [1957]; and 15A Couch on Insurance § 56.21 [2d ed. 1983]). Although aspects of the cause theory do appear to have been adopted by our courts, this does not answer the question, as evidenced by the parties' disagreement as to what constitutes the cause in this case: RLI argues that the cause of the injuries here was Lo's shooting, whereas American takes the position that the conduct of the college and its employees in allegedly failing to prevent the shooting was the cause. We therefore precede our discussion of the ultimate issue — the number of occurrences — with a discussion of what determines the "cause" of injury in this context. We emphasize that when we speak in this opinion about cause of injury we are referring to that cause or occurrence that gives rise to insurance coverage.

This may or may not be the same as the cause or causes of injury for purposes of tort liability.[2]

We conclude that when the issue is the number of occurrences, we must look to the "cause" of the injury by reference to the conduct of the insured for which coverage is afforded, and that "cause" and "occurrence" are indistinguishable for purposes of this analysis.[3] Our view is supported both by the terms of the relevant policy of insurance and by decisional law.

American's policy provides general liability coverage for "those sums that the Insured becomes legally obligated to pay as damages because of 'bodily injury' . . . caused by an 'occurrence,'" with occurrence defined as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions."[4] Specifically excluded is coverage

---

[2]That the distinction is important is particularly evident in this discussion about the number of occurrences. Confusion can arise when, as is often the case in opinions discussing the issue, the language of tort liability is called upon to inform the language of insurance risk coverage. In this case, for example, RLI's position — that the number of occurrences is determined by reference to the immediate cause of the victim's injuries, i.e., Lo's shooting — is based upon the assumption that "cause of injury" is that cause which, in a tort liability sense, is the immediate cause of harm, albeit not the exclusive proximate cause. This ignores the fact that the issue to be determined is not liability, but the contractual obligation of an insurer to an insured. See discussion, *infra.*

[3]"Cause" and "occurrence" in this context are not to be confused with the "trigger of coverage" issue, which identifies the time of the occurrence for purposes of determining whether a claim falls within the policy period of a particular contract of insurance. "[I]t is important to distinguish concepts of cause and effect as they relate to the related purposes of determining which policy applies and how many policy limits are triggered. A liability policy is not 'triggered' by the happening of an 'occurrence.' Rather, it is triggered at the point in time when an 'occurrence' results in bodily injury or property damage." Aylward, Multiple "Occurrences" — A Divisive Issue, 5 Coverage 39 (Jan./Feb. 1995).

[4]The American policy provides, in pertinent part:

"COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY

"1. Insuring Agreement

"a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' . . . . But

for bodily injury that is "expected or intended from the standpoint of the Insured."

In this case, where the underlying claims against the school and its employees are for negligence, it is their allegedly negligent acts or omissions in failing to prevent Lo from using his gun that constitute the occurrence for purposes of determining general liability coverage provided by American's policy. See, e.g., *Washoe County* v. *Transcontinental Ins. Co.*, 110 Nev. 798, 804 (1994), a case where the employee of a private day care facility licensed by the county allegedly abused children at the facility. The plaintiffs in the underlying action alleged that the county was negligent in the process of licensing the facility. The court held that, for purposes of determining the county's insurance coverage, the county's negligence was the cause of the children's injuries. "[E]ven though the action of the individual wrongdoer[] [is] the most direct cause[] of harm for the victims . . . the actions of the individual wrongdoer[] taken alone are not the basis of liability . . . . Instead, liability . . . is premised on the [county's] negligence in performing a duty, which permitted the intervening conduct of [the wrongdoer] who actively caused the victims' harm."

A similar analysis obtained in *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. 393 (1990), a case involving policies of insurance containing definitions of "occurrence" substantially identical to the one at issue here.[5,6] As in *Washoe County, supra,* the case in *Fells Acres* involved coverage related

---

(1) the amount we will pay for damages is limited as described in Limits of Insurance.

. . .

"b. This insurance applies to 'bodily injury' and 'property damage' only if:

(1) the 'bodily injury' or 'property damage' *is caused by an 'occurrence' that takes place in the 'coverage territory.'* "

[5]The provision in the special multi-peril policy issued by Worcester Insurance Company provided coverage for an "occurrence" defined as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury . . . neither expected nor intended from the standpoint of the insured," *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. at 398 n.6 (emphasis omitted), and is comparable to the language in American's policy.

[6]We disagree with RLI's contention that the term "occurrence" as defined by

to the abuse of children at a day care center by the facility's employees. In determining that there could be insurance coverage for acts of negligence by the school and its employees, the Supreme Judicial Court relied on "conventional negligence theory," 408 Mass. at 410, focusing on the insureds' negligence in the hiring, retention, and supervision of the employees who committed the assaults. *Id.* at 407-411.[7] Thus, in *Fells Acres*, as in *Washoe County*, and, as we conclude, in the matter at hand, it is an insured's actions or failures to act (here the alleged negligence) and not the deliberate acts of a wrongdoer that constitute the "cause" of the victims' injuries. See also Aylward, Multiple "Occurrences" — A Divisive Issue, 5 Coverage 39, 40 (Jan./Feb. 1995) ("where the insured's conduct was remote to the immediate cause of the plaintiff's injuries, as in products liability cases or theories of liability based on negligent training, supervision or inspection, the direct cause of injury may have little relevance to the 'cause' for purposes of ascertaining the number of 'occurrences' ").

As Judge Weinstein observed in *Uniroyal Inc.* v. *Home Ins.*

the American policy is ambiguous when applied to the present circumstances. We therefore need not decide whether the policy provisions must be construed against American, *Hakim* v. *Massachusetts Insurers' Insolvency Fund*, 424 Mass. 275, 281 (1997), or whether the rule of insurance contract interpretation construing any ambiguity against the insurer and in favor of the insured does not apply to cases involving a dispute between insurance companies. *Union Carbide Corp.* v. *Travelers Indem. Co.*, 399 F. Supp. 12, 15-16 (W.D. Pa. 1975). *Hatch* v. *First Am. Title Ins. Co.*, 895 F. Supp. 10, 13 (D. Mass. 1995), quoting from *Falmouth Natl. Bank* v. *Ticor Title Ins. Co.*, 920 F.2d 1058, 1062 (1st Cir. 1990) ("[t]he rationale behind interpreting ambiguities against the insurer would not seem to apply as strongly when the transaction is between two parties of equal sophistication and equal bargaining power").

[7] The legal analysis in *Fells Acres* was complicated by the fact that, unlike in *Washoe County*, or the matter before us, the individual assailants were also insureds, as they were corporate officers and stockholders of the school, as well as staff members. The court thus had to distinguish between the actions of the insureds as assailants (herein, wrongdoers), and the allegedly negligent actions of the insureds in their other capacities, excluding their own acts of abuse. The court determined that there was no insurance coverage for the wrongdoers' assaults on the victims, holding that, as matter of law, none of the claims of sexual assault of the minor plaintiffs was covered because the children's injuries necessarily were expected or intended from the point of view of the insured/wrongdoer (and therefore did not result from an accident or occurrence within the meaning of the policy). *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. at 399-403.

*Co.*, 707 F. Supp. 1368, 1383 (E.D.N.Y. 1988),[8] "Since the policy was intended to insure [the college] for its liabilities, the occurrence should be an event over which [the college] had some control. Otherwise, with the covered risks out of the insured's hands and coverage for losses determined by the acts of the unfettered [shooter], the insurer would have no basis for setting premiums *ex ante* and the insurance contract would be illusory." Other jurisdictions have similarly held that "[i]n interpreting coverage for . . . entities [such as the college here] under the 'causal' approach, 'occurrence' should be defined in such a way as to give meaning to the entity's connection to liability." *Washoe County* v. *Transcontinental Ins. Co.*, 110 Nev. at 805. Cf. Windt, Insurance Claims and Disputes § 11.3, at 298 (4th ed. 2001) ("whether an accident is present should be considered from the point of view of the insured").

In addition to determining whether conduct of an insured constitutes an insured risk under a general liability insurance policy, we also look to such conduct to answer the question whether there was a single occurrence or multiple occurrences for purposes of determining "per occurrence" liability of an insurer.[9] We therefore look to the alleged acts of the insured college and its employees in failing to prevent Lo from engaging in the shooting spree as determining the number of occurrences, and not to the acts of Lo himself. By way of illustration, we turn to *Travelers Indem. Co.* v. *Olive's Sporting Goods, Inc.*, 297 Ark. 516 (1989), a case involving facts similar to those before us. There, the insured store allegedly sold a pistol and shotgun to one Wayne Crossley, who then used the weapons to shoot a police officer and kill and wound several others, before committing suicide. The court focused on the insured in deciding the issue of the number of occurrences, and determined that the occurrence was the sale of weapons, noting that "[t]o decide

---

[8]In *Uniroyal Inc.* v. *Home Ins. Co.*, *supra* at 1382-1383, the court determined that each spraying of "Agent Orange" did not constitute a separate occurrence, holding that the single occurrence was plaintiff insured's delivery of herbicides to the military: "The delivery was the last act performed by Uniroyal in which it exercised any control over the herbicides." *Id.* at 1383.

[9]This is a question that is distinct from the question of the harm or injury giving rise to, or triggering, the coverage. See note 3, *supra*.

that each of the injuries required separate coverage under the policy would in effect put a no-limit policy into effect." *Id.* at 522. Compare *State Farm Lloyds, Inc.* v. *Williams*, 960 S.W.2d 781, 785 (Tex. Ct. App. 1997) (where insured shooter was covered by his homeowner's policy, "the insured's liability arose out of the shootings"). Thus, it is with reference to the conduct of the college and its employees that we now determine the question of the number of occurrences under American's policy of insurance.

As we observed earlier in this opinion, occurrence is defined in American's policy as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." "The term 'occurrence' that appears in the policies was used by the insurance industry instead of the term 'accident' beginning in the 1960's. The term 'occurrence' was adopted 'to dispel any existing notion that [coverage] was limited to sudden happenings.' " *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. at 416. The unambiguous language of American's policy, considered in the light of this historical backdrop, clearly contemplates the possibility that multiple acts taking place over a space of time may contribute to a single occurrence for purposes of coverage. We do not read *Fells Acres* as requiring the conclusion that the acts of the college and its employees constituted multiple occurrences. The court in that case, noting that there were allegations of "numerous discrete acts of . . . negligence . . . and breach of duty" resulting in, or that failed to prevent, the abuse of the children over a lengthy period of time by multiple defendants in various locations, held that "[t]hese allegations preclude the possibility that there was but a 'single, ongoing cause' of the injuries alleged." *Id.* at 417. Nor does *Slater* v. *United States Fid. & Guar. Co.*, 379 Mass. 801 (1980), require a different result.[10]

There is nothing in the agreed upon facts to suggest that any

---

[10]The insured orthodontist in *Slater* had a property insurance policy that specifically covered losses of money "for an amount not exceeding $250 in any one occurrence." 379 Mass. at 802. Over a period of two years, the doctor's receptionist embezzled a total of $9,000, with no one theft exceeding $250. The court concluded that each act of embezzlement constituted a

of the acts or omissions on the part of the insured defendants was a "discrete" act of liability so separated by time and location as to warrant the conclusion that each such act resulted in Lo having access to a weapon that he then used to shoot several people. Unlike in *Fells Acres*, it cannot be said that each alleged act of negligence resulted in a discrete injury. Rather, all the negligent acts combined to result in Lo's eighteen-minute rampage. Cf. *Appalachian Ins. Co.* v. *Liberty Mut. Ins. Co.*, 676 F.2d 56, 59, 61 (3d Cir. 1982) (primary issue was when occurrence took place, but court also noted that where policy defined "occurrence" as an "accident or happening or event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in . . . injury," the insured's policy contemplated "multiple and disparate impacts on individuals and that injuries may extend over a period of time," and held that discriminatory employment policy constituted a single occurrence). Although several events have been described as leading to Lo's shooting spree (e.g., the failure to search Lo's room, to confiscate his weapons parts, to call Lo's parents, to call the police), these facts do not describe separate occurrences, but rather constitute evidence of an arguably inadequate policy of security and student supervision that may have contributed to Lo's ultimate access to a murder weapon. It is this alleged failure or inadequacy of the college's policy that forms the basis of the insureds' liability here, and constitutes a single occurrence for insurance coverage purposes.[11]

The cases relied on by RLI, see, e.g., *American Indem. Co.* v. *McQuaig*, 435 So. 2d 414 (Fla. Dist. Ct. App. 1983); *State*

---

separate occurrence. Because "occurrence" was not defined in that policy, the term was construed against the insurer. *Id.* at 802-804. In addition to the distinguishing fact that in American's policy the term "occurrence" is defined, we further note that the insurance policy at issue in *Slater* was not a policy of general liability coverage for accidents resulting in third party injury.

[11]We do not intend to preclude the possibility that multiple occurrences might be found to exist in other cases involving a failure to supervise or to implement a security policy. See, e.g., *Worcester Ins. Co.* v. *Fells Acres Day Sch., Inc.*, 408 Mass. at 417 (multiple occurrences in light of time, space, and the number of defendants and acts of abuse). Cf. *Slater* v. *United States Fid. & Guar. Co.*, 379 Mass. at 806-807 (noting that multiple occurrences have been found "when the cause is interrupted, either by an independent cause, or by the actor regaining control over the causing factor"). We think that the issue must in each instance be determined by the facts of a given case.

*Farm Lloyds, Inc.* v. *Williams*, 960 S.W.2d at 784-785, are inapposite. In these cases, the multiple, discrete acts of an insured, whose shooting of several people was separated (albeit briefly) by time was found to constitute more than one occurrence. There, unlike in the instant case, the shootings were the "cause" because conducted by the insured.[12] The conduct of the gunman, and not any negligent act or failed policy of supervision, was the relevant conduct in determining the number of occurrences within the meaning of the policy.

We conclude that the underlying claims in this case arose from a single occurrence under the terms of American's policy, limiting American's liability to $1 million.

*Judgment affirmed.*

---

[12]In *State Farm Lloyds, Inc.* v. *Williams, supra* at 785, the court noted that "the insured's liability arose out of the shootings . . . . [The victims] were not injured by a single shot. Rather, their injuries resulted from two separate acts. Because each 'act' independently gave rise to liability, we conclude the shootings constituted two separate occurrences under the policy." In *McQuaig*, the insured's shooting of two sheriffs, firing at three separate intervals separated by brief spans of time, was held to constitute three separate occurrences. *American Indem. Co.* v. *McQuaig, supra* at 415.