Fabricant, Judith, J.
INTRODUCTION
This action presents a dispute over insurance coverage for environmental damage claims. In this action, plaintiff Keyspan New England, LLC (Keyspan), seeks indemnification for claims against it arising out of contamination of the Island End River, the Mystic River, and Boston Harbor, and of adjacent land, during ownership of the land by Keyspan’s predecessor in interest, Eastern Gas & Fuel Associates (Eastern). The matter is before the court on motions for summary judgment addressing three separate coverage issues: Continental Casualty’s (Continental) motion for partial summary judgment based on trigger of coverage; Continental’s motion for partial summary judgment and Keyspan’s cross motion for partial summary judgment addressing issues of misrepresentation and known loss; and Continental’s motion for partial summary judgment and Keyspan’s cross motion for partial summary judgment addressing the number of occurrences. For the reasons that will be explained, sum *512 mary judgment will enter for Keyspan on the trigger and known loss issues, and for Continental on the number of occurrences.
BACKGROUND
The record before the Court establishes the following facts as undisputed. Before natural gas became widely available, facilities known as manufactured gas plants produced manufactured gas used for heating, lighting, and cooking. From about 1899 until 1960, Keyspan’s predecessor, Eastern Gas & Fuel Associates, later known as Eastern Enterprises, operated a manufactured gas plant on approximately 260 acres of land located between the Island End River and the Mystic River in Chelsea and Everett (the Everett complex).[3] In 1961 and 1964 respectively, Continental issued to Eastern two three-year umbrella excess insurance policies which, among other things, and with certain limitations, provided coverage of $1,000,000 per occurrence for third-party environmental damage claims.
The manufactured gas plant on the Everett complex consisted of several different but interrelated industrial operations all designed to produce coke and other marketable by-products. The process began in a battery of ovens (the coke works), operated by Eastern, which super-heated raw, bituminous coal, thus converting it into coke, a clean burning fuel widely used in the late 19th and early 20th centuries. In addition to coke, the process also produced other marketable commodities, in particular coal tar and coal gas. Eastern delivered the coal tar from the coke works to its tar transfer station on the site, where it was stored in two one-million-and two thirty-thousand-gallon tanks.
Eastern leased a portion of its land, initially to Barrett Tar Company, now Honeywell International, Inc. (Barrett). Barrett built a coal tar refining plant, which it sold in 1936, along with its equipment and operations on the site, to the Koppers Company, now Beazer East, Inc. (Koppers). Thereafter, Koppers continued to lease the land from Eastern until 1960. Eastern sold coal tar from the coke works first to Barrett and then to Koppers, which then pumped it from the tar transfer station to the tar refinery as needed and there converted it into refined tar products, such as road tar, roofing pitch, water proofing pitch, and creosote.[4]
In addition to the coke works, Eastern operated two other plants on the Everett complex, the byproducts plant and the benzol plant, both designed to further refine the byproducts from the coke works. The byproducts plant cooled the raw coal gas from the coke works, causing tar and other residuals to condense in the pipes. The pipes were routinely flushed with an ammonia-based liquid and the resulting tar was recovered and delivered to the tar transfer station for use by Koppers. Eastern piped the processed coal gas from the byproducts plant to the benzol plant for further purification, and sold the finished product to Boston Consolidated Gas (Boston Gas). The byproducts plant also yielded more tar, as well as ammonia compounds, siyrene, and naphthalene; the benzol plant yielded light oils, such as benzene, toluene, and xylene. Also located on the Everett complex was an area known as the Island End River Oxbow (the oxbow). Over many years in the early to mid 1900s, Eastern used the oxbow to dispose of the waste products generated by its various manufacturing processes. There is evidence that other entities also disposed of waste in the oxbow.[5]
In the summer of 1949, Eastern learned that the Massachusetts Attorney General’s office was preparing to take action against it, as well as against Boston Gas, Esso Standard Oil, and Koppers, alleging that they had caused a public nuisance by polluting the waters in the Island End River, the Mystic River, and Boston Harbor. The attorney general alleged that contaminants in the waters increased the fire hazard to piers, docks, and bulkheads; made beaches unfit for bathing; and interfered with boating, commercial fishing, and the processing of fish and shellfish for food. Following a conference that included all four companies and representatives from multiple public agencies, Eastern and Boston Gas retained Metcalf & Eddy, an engineering firm, to investigate their operations and make recommendations.
In a comprehensive report dated March 16, 1950, Metcalf & Eddy concluded that seven of seventeen drain outlets serving the Everett complex were at times discharging tars, oils, or scum into the rivers; large quantities of tar were entering the ground through leaking pipes and broken manholes; and oils and tar were present particularly in the benzol plant and byproducts plant yards. Of particular concern was drain number four, where effluent discharged directly onto mud flats below showed a noticeable oil film that, under certain conditions, would form a well-defined film on the river’s surface. At the conclusion of its report, Metcalf & Eddy made several recommendations to reduce or prevent further contamination, including the installation and/or replacement of numerous baffles throughout the complex; filling the cove at drain outlet number four to an elevation above the high water mark; repairing and replacing a pipe in the benzol plant; rebuilding various coke ovens; and monitoring all discharges.
Eastern offers evidence that it implemented these recommendations, and reduced the flow of effluent, by installing new manhole covers and repairing various broken pipes through which pollutants were seeping into the drainage system and thus into the rivers, unearthing drain number four from its outlet in the Island End River and inland to a point where the soil showed no sign of tar, filling in the excavated area around the pipe with iron ore dust to prevent further migration of tar into the drain system, installing drip *513 pans throughout the site, and adopting monitoring and maintenance procedures. Further, according to Eastern’s evidence, Koppers took its own separate measures, with Eastern’s approval as required under the lease agreement, including installing an oil/water separator, and placing coke filters to treat wastewater discharges before their release into the river.[6] The Attorney General did not proceed with enforcement action.
With the advent of natural gas, the demand for manufactured gas and coke decreased. As a result, all operations on the Everett complex ceased in 1960. Eastern demolished the buildings and, over the next twenty or so years, parceled the land and sold it off. It is undisputed that while the plant was operational, various long-lasting hazardous materials, primarily tar and oil, also known as non-aqueous phase liquids (NAPL),[7] were discharged directly into the Mystic River and the Island End River, or accidentally leaked and spilled from the plants into the ground. Once tar and oil enter the environment, they tend to migrate, or flow, and to contaminate soil and water well beyond the original discharge site. Over time, and continuing after the complex ceased operations, contaminants including volatile organic chemicals such as benzene, toluene, ethyobenzene, and xylene (BTEX), and polycyclic hydrocarbons (PAHs), leached from the tar and oils and migrated at varying rates through the soil and then into the underlying groundwater or directly into the Island End River, as well as contaminating the soil. The various operations in the Everett complex discharged different toxic materials in different amounts, leaving different types of soil contamination in the areas of each facility.[8] In addition, the record includes uncontested expert opinion that releases of contaminants occurred in the 1960s from tar tanks left on the site and during the demolition of structures at the complex.
On October 18, 1984, the Department of Environmental Quality Engineering (DEQE) issued a Notice of Responsibility (NOR), pursuant to G.L.c. 21E, informing Eastern that it was potentially responsible for remediation of an 8.4-acre parcel (later expanded to 10 acres) upon which the tar refinery had formerly stood, as well as affected areas of the Island End River, due to the presence of coal tars in the soil and related contaminants migrating into the river. On February 5, 1999, DEQE’s successor, the Department of Environmental Protection, issued an NOR to Eastern regarding tar boils observed at the tar transfer station. On July 23, 1999, the DEP issued an additional NOR to Eastern relative to contamination at the oxbow. Finally, on February 1, 2005, the DEP issued yet another NOR to Keyspan concerning the areas formerly occupied by the benzol and byproducts plants, as well as affected portions of the Mystic River. In addition to these governmental actions, two private owners of portions of the Everett complex land have claimed that Eastern and Keyspan are liable for response costs they have incurred.
The question presented by the present motions is whether and to what extent Continental’s policies obligate it to indemnify Keyspan for liability resulting from these claims. Continental contends that it is under no such obligation because: (1) there was no “occurrence” during the policy period to trigger coverage; and (2) the current claims arise out of conditions and losses of which Keyspan’s predecessor was well aware, so that the “known loss” doctrine precludes coverage. Continental further argues that, even if coverage exists, the claims arise from but a single occurrence, thus limiting coverage to the maximum for one occurrence. Continental has moved for summary judgment on all three theories; Keyspan has cross moved on the latter two issues.
DISCUSSION
The interpretation of an insurance policy is a question of law for the court, Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 146 (1982), and interpretation of unambiguous terms is appropriate for summary judgment. Sullivan v. Southland Life Ins. Co., 67 Mass.App.Ct. 439, 442 (2006). Where the provisions of an insurance policy are plainly expressed, the policy must be enforced in accordance with its terms, Cody, 387 Mass. at 146, and interpreted in a manner consistent with the expectations of an objectively reasonable insured. McGregor v. Allamerica Ins. Co., 449 Mass. 400, 402 (2007); City Fuel Corp. v. National Fire Ins. Co. of Hartford, 446 Mass. 638, 642-43 (2006). If, however, the contract is ambiguous, “doubts as to the meaning of the words must be resolved against the insurance company that employed them and in favor of the insured.” August A. Busch & Co. of Mass. v. Liberty Mut Ins. Co., 339 Mass. 239, 243 (1959). “A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one.” County of Barnstable v. American Fin. Corp., 51 Mass.App.Ct. 213, 215 (2001). An ambiguity is not created, however, simply because there is a controversy between the parties as to the interpretation of the policy provisions. Lumbermens Mut. Cas. Co. v. Offices Unlimited, Inc., 419 Mass. 462, 466 (1995). The insured bears the burden of proving that its response to the underlying claims is among the risks covered by the insurer’s policy. Markline Co. v. Travelers Ins. Co., 384 Mass. 139, 140 (1981).
1. Trigger of coverage.
Each of the policies at issue contains two clauses that bear on the trigger of coverage issue: a “Policy Period — Territory” clause, and a definition of “occurrence.” The Policy Period — Territory clause states that “(t]his policy only applies to ‘occurrences’ as defined herein, happening during the policy period anywhere in the world.” The policy in effect between 1961 and 1964 defines “occurrence” as follows:
The term “Occurrence,” whenever used herein, shall mean an unexpected or unintended event, or continuous or repeated exposure to conditions, *514 which unexpectedly or unintentionally causes injury, damage, or destruction during the policy period. All such exposure to substantially the same general conditions existing or emanating from each premises location during the policy period shall be deemed one occurrence.
The policy in effect between 1964 and 1967 defines the term essentially the same way:
The term “Occurrence” means an event or continuous or repeated exposure to conditions, which unexpectedly causes Personal Injuty and/or Property Damage and/or Advertising Liability during the policy period. All such exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed one occurrence.
Based on the combination of these provisions, Continental contends that the policies require, for coverage to be triggered, that both the event or exposure causing property damage, and the resulting property damage, occur during the policy period. Because there was no release of contaminants after 1960, when the industrial plant ceased operations, the argument goes, Keyspan cannot establish that the underlying environmental claims arise out of an “occurrence” that took place during the policy period. Keyspan, on the other hand, reads the policy as requiring only that property damage take place during the policy period to trigger coverage, and further argues that, even if both are required, contaminants were in fact released during the policy period, thus triggering coverage even under Continental’s interpretation of the policy language.[9]
“ Trigger of coverage’ is a term of art whereby the court describes what must occur during the policy period for potential coverage to commence under the specific terms of an insurance policy.” Rubenstein v. Royal Ins. Co. of America, 44 Mass.App.Ct. 842, 850 n.6 (1998); see A.W. Chesterton v. Massachusetts Insurers Insolvency Fund, 445 Mass. 502, 518 (2005). To identify the trigger of coverage applicable in each case, a court must “look to the policy as written; we neither revise it nor change the order of the words.” Id., quoting Continental Cas. Co. v. Gilbane Bldg. Co., 391 Mass. 143, 147 (1984).
Courts have, in this regard, devised several different theories. Rubenstein, 44 Mass.App.Ct. at 850 n.6.; see Trustees of Tufts Univ. v. Commercial Union Ins. Co., 415 Mass. 844, 854 n.9 (1993); Gencorp, Inc. v. AIU Ins. Co., 104 F.Sup.2d 740, 745 (N.D. Ohio 2000); EnergyNorth Natural Gas, Inc. v. Underwriters at Lloyd’s, 150 N.H. 828, 831 (2004). If coverage is triggered at the time the property damage is or should be known to the owner, the approach is known as the “manifestation theoiy.” Rubenstein, 44 Mass.App.Ct. at 850 n.6. Where coverage is triggered when the property damage first occurs, the approach is known as the “injuiy-in-fact” theory. Id. Should coverage commence when the first exposure to the injury causing conditions occurs, this is the “exposure theoiy.” Id. and cases cited. Finally, if property damage occurs during each year from the time of the first hazardous exposure through manifestation, that is known as the “continuous” or “multiple” theoiy. Trustees of Tufts, 415 Mass. at 854 n.9. Under any of the above approaches, it is the language of the policy that controls. Rubenstein, 44 Mass.App.Ct. at 851.
Environmental liability claims present a particularly complex and nuanced scenario, because exposure to toxic materials typically inflicts property damage not only immediately, by the release of contaminated effluent directly into the soil or water, but also over a period of many years, due to the leaching and migration of toxic materials over time. The Supreme Judicial Court addressed that problem in Trustees of Tufts, supra. The policy in issue there obligated the insurer to pay for “property damage” caused by an “occurrence,” defined to include “exposure to conditions, which results, during the policy period ... in property damage.” 415 Mass. at 847-48. The Court construed this language to mean that “the ‘occurrence’ is the ‘injurious exposure’ to the hazardous material during the policy period.” The ‘property damage’ is the continued contamination of soil and groundwater on the site during the policy periods caused by the release of hazardous material." Id. at 848. Relying on Gilbane, 391 Mass. at 147, the court distinguished between the causative act — the exposure — and the injurious result of that act — the damage. Trustees of Tufts, 415 Mass. at 850. It concluded that “the event giving rise to coverage under an occurrence-based policy is the happening of the actual property damage, and not the causative act.” Id. at 851. See also Rubenstein, 44 Mass.App.Ct. at 851 (interpreting similar policy language).[10] Thus, the Court held, the policy covered contamination that continued through the policy period, although the insured had ceased any operations on the property that could have generated releases many years before the policy period.
Here, the policy language, particularly the Policy Period — Territoiy clause, unequivocally limits coverage to “ ‘occurrences’, as defined herein, happening during the policy period.” Clearly, the occurrence, as defined in the policy, must have happened within the policy period. The question, for purposes of the trigger analysis, is what is the occurrence that must happen during the policy period. The Policy Period — Territory clause does not supply the definition of occurrence, but rather makes reference to the definition of that term provided elsewhere in the policy. That definition, in each policy, incorporates two elements: an “event, or continuous or repeated exposure to conditions,” and resulting injury or damage “during the policy period.” The definition of occurrence in each policy expresses the temporal limitation at the end of the sentence, after the reference to injury or damage. The plain meaning of the language, in each definition is that “during the policy period” refers to the injury or damage, not to the event or exposure. Thus, “occur *515 rence” is defined as an event or exposure that causes injuiy or damage during the policy period. The word has that meaning throughout the policies — including in the Policy Period — Territory clause. It follows, based on the plain language of the policies, that the time limitation in the “Policy Period — Territory” clause is met if the time limitation in the definition of occurrence is met — that is, if the damage happens within the policy period; the event or exposure that causes the damage need not itself happen within that period.
Continental rests its contrary argument primarily on A.W. Chesterton, 445 Mass. at 519. That case involved personal injuiy resulting from exposure to asbestos. The policy covered “damages because of personal injuiy . . . caused by an occurrence anywhere during the policy period.” The policy went on to define “occurrence,” to include an “event” or “continuous or repeated exposure to conditions, which results in personal injury.” The definition expressed no temporal limitation; the only such limitation appearing in the policy was the one in the coverage clause, quoted supra, that followed immediately after “occurrence.” Based on this language, the Court concluded that “during the policy period” modified only “occurrence,” so that it was the occurrence, not the injuiy, that must take place during the policy period. Id, at 520. The occurrence, the Court concluded, was the event or exposure that caused the injuiy. Thus, the Court held, each exposure to or inhalation of asbestos triggered coverage, regardless of when injuiy became manifest. Id, at 521.
A.W. Chesterton does not assist Continental, because it construed policy language that differed from the language involved here in the respect most important to the issue in dispute: the definition of occurrence. Under the definition in these policies, what must have happened during the policy period is the property damage, not the event or exposure causing such damage. The parties do not dispute that property damage, in the form of continued migration of hazardous materials, occurred during the policy period. That damage triggered coverage under the policies.[11]
Moreover, as Keyspan points out, even if the Court were to adopt Continental’s interpretation, the policies would still provide coverage, because the undisputed facts set forth supra indicate that exposure to conditions resulting in property damage occurred even after the cessation of operations at the complex, through the leaching and migration of toxic materials from the original dispersal site over time. Indeed, it appears that, by the nature of the contamination involved, such exposure continues indefinitely, until the contamination is removed from the soil. Under the plain language of the policy, that continuous exposure constitutes an occurrence. See Rubenstein, 44 Mass.App.Ct. at 851; EnergyNorth Natural Gas, Inc. 150 N.H. at 840-41 (“The language of the policy clearly embodies an exposure trigger, and where the alleged migration of toxic wastes is continuing, multiple exposures triggering coverage are also continuing”). In addition, the record indicates that further releases of toxic materials occurred after the cessation of operations on the site from tar tanks left at the site and during demolition of structures. Thus, under either interpretation of the policy, coverage is available. Key-span is entitled to summary judgment on the trigger of coverage issue, pursuant to Mass.R.Civ.P. 56(c).
2. Known Loss.
Both sides have moved for summary judgment on Continental’s defense of “known loss.”[12] The known loss doctrine precludes insurance coverage for losses known to the insured at the time the insured purchases a policy. See SCA Services, Inc. v. Transportation Ins. Co., 419 Mass. 528, 532 (1995). The doctrine is a matter of common law, separate from any policy language, and is based on the veiy nature of insurance, which “is based on contingent risks which may or may not occur.” Id. As the Court observed in SCA,
[T|he basic purpose of insurance is to protect against fortuitous events and not against known certainties. Parties wager against the occurrence or nonoccurrence of a specified event; the carrier insures against a risk, not a certainty ... It follows from this general principle that an insured cannot insure against the consequences of an event which has already begun ... (I)nsurable risk is eliminated in the instance where an insured knows, when it purchases a policy, that there is a substantial probability that it will suffer or has already suffered a loss. At that point, the risk ceases to be contingent and becomes a probable or known loss. When the insured has evidence of a probable loss when it purchases the policy, the loss is uninsurable under that policy.
Id. at 532-33 (internal citations omitted).
The facts of SCA are illustrative. Two underlying suits were involved. In the first, filed in 1977, residents of the town of Wilsonville, Illinois, sued SCA to enjoin its operation of a hazardous waste disposal site on the ground of nuisance. That action went to trial, resulting in a declaration that the site was a nuisance, and an order that its operations cease. The judgment, issued in 1978, was affirmed on appeal in 1981. In 1980, after that judgment had entered, SCA purchased the insurance policy in issue. In 1982, a group of Wilsonville residents brought a second suit, seeking damages for personal injury resulting from operation of the hazardous waste disposal site that had already been adjudicated a nuisance. Id. at 529-30. The Supreme Judicial Court held that the insurance policy provided no coverage for that suit, because SCA’s liability for operating a nuisance at the site had already been adjudicated prior to the purchase of the policy, and was therefore a known loss at that time. Id. at 534.
The Supreme Judicial Court next applied the doctrine, to different facts with a different result, in Allmerica Financial Corp. v. Certain Underwriters at *516 Lloyd’s, London, 449 Mass. 621 (1997). There the insured was a seller of life insurance. At the time it purchased the liability policy in issue, it was a defendant in a number of pending suits, which it disclosed in the policy application, alleging misrepresentations and other wrongdoing in the sale of vanishing premium life insurance. After the purchase of the policy, the insured was faced with a class action suit raising similar allegations, and sought defense and indemnification. The insurer refused, citing the known loss doctrine. Id. at 623-27. The Court held the doctrine inapplicable, because the insured “had knowledge of possible and actual claims . . . but not probable or actual losses.” Id. at 637. The Court cited with approval United States Liab. Ins. Co. v. Selman, 70 F.3d 684, 691 (1st Cir. 1995), in which the First Circuit ruled that “the known loss doctrine only applies when the insured actually knows on or before the effective date of the policy either that a loss has occurred or that one is substantially certain to occur.”
These authorities leave no doubt that the known loss doctrine has no application here. These policies cover liability; thus a loss, for purposes of the policy, is liability to a third party, not the injury or property damage giving rise to such liability. Before it purchased the policies, Eastern knew of contamination, and knew that the Attorney General had threatened suit, but had backed off after Eastern had taken steps to reduce or eliminate discharges. It did not know, and could not have known, that more than twenty years later it would be faced with claims of liability based on statutes yet to be enacted.[13] Still less did it know that liability would actually be determined against it; indeed, as far as the record discloses, liability has not been adjudicated to this day. Keyspan is entitled to judgment as a matter of law on Continental’s defense of known loss.
3. Number of Occurrences.
Both Keyspan and Continental have moved for summary judgment regarding the number of occurrences for which Keyspan could recover the $1,000,000 per occurrence available under the policies. Keyspan claims six occurrences; Continental contends there was only one. Keyspan’s theory is that what defines a separate occurrence for purposes of this issue is a “distinct injury causing mechanism,” and that each of the six operations at its complex (the coke works, tar transfer station, tar refinery, byproducts plant, benzol plant, and oxbow) was a distinct injury causing mechanism, and therefore a separate occurrence. Continental emphasizes the interrelated nature of all the operations on the complex, and of the contamination resulting from those operations, along with the policy language. The issue is difficult, and the Court finds no case precisely on point, but ultimately the Court concludes that Continental has the better part of the argument.
The analysis must start with the plain language of Continental’s policies, both of which define an “occurrence” as “continuous or repeated exposure to conditions . . . ,” and provide that “(a]ll such exposure to substantially the same general conditions existing at or emanating from each premises location shall be deemed one occurrence.” The policies do not define “premises location” or identify any particular location. Throughout their principal briefs, both sides appear to view the entire Everett complex as a single premises location, and indeed the facts set forth supra indicate strongly that it functioned as an integrated whole. In its reply brief, however, Keyspan takes a different tack, referring to each of the various facilities at the complex as separate sites, and suggesting that the phrase “premises location” may be ambiguous, requiring construction in favor of the insured. The parties engage in similar jousting regarding “the same general conditions”; Continental characterizes exposure to repeated releases of toxic materials as the same general conditions, while Keyspan attempts to differentiate conditions based on the different contaminants associated with the various operations.
Keyspan relies on three decisions of the Supreme Judicial Court; Slater v. United States Fidelity and Guar. Co., 379 Mass. 801, 805 (1980); Continental Cas. Co. v. Gilbane Bldg Co., 391 Mass. 143 (1984); and Worcester Ins. Co. v. Fells Acres Day School, 408 Mass. 393, 416 (1990). Each of these cases is somewhat instructive on the issue presented here, but none provides a clear answer. Slater involved a series of thefts by an employee of the insured over a two-year period, under a policy that provided no definition of “occurrence.” 379 Mass. at 803, 809. In the absence of a definition, the Court found the policy ambiguous, and therefore construed it in favor of the insured, treating each theft as a separate occurrence. Id. at 809. The decision offers little help here, where the policy provides a detailed definition.
In Gilbane, the issue was the duty to defend, not indemnification. The insured was the general contractor for the John Hancock building, where glass panels in the curtain walls had failed both during construction and after completion. 391 Mass. at 146. Under a definition of “occurrence” virtually identical to that in this case, the insurer argued that the failures were a single occurrence, having arisen from exposure to the same conditions, and were therefore subject to an exclusion for damage to property “being installed, erected, or worked upon.” 391 Mass. at 151. The Court resolved the issue based on the allegations of the complaint, which it determined were “ ‘reasonably susceptible’ of the interpretation that stresses to which the curtain wall was subjected as part of the Tower differed significantly from the stresses which were placed on the individual glass panels during construction,” so that “precompletion and postcompletion property damage did not arise ‘out of continuous or repeated exposure to substantially the same conditions.’ ” 391 Mass. at 152-53. Here, the issue is the duty to indemnify, not to defend, and the *517 basis for decision is a full factual record, not the mere allegations of the complaint.
Fells Acres arose from a series of acts of sexual abuse against a number of children at a day care center. The underlying actions asserted claims on behalf of multiple plaintiffs against a list of insured defendants, based on numerous alleged incidents taking place in various locations on various dates. 408 Mass. at 395-97. The insurer argued that all of the claims presented a single occurrence, because they arose from continuous and repeated exposure to abusive conditions at the center. 408 Mass. at 416. The Court rejected that theory, pointing out that the plaintiffs in the underlying cases “allege numerous discrete acts of abuse, negligence, and breach of duty by several different defendants, some individual and one corporate, at different locations.” 408 Mass. at 417. The Court commented further that “we have rejected attempts by insurers to characterize seemingly discrete events as emanating from a single, ongoing cause.” Id., citing Gilbane, 391 Mass. at 151, and Slater, 379 Mass. at 809.
The allegations involved in Fells Acres bear little similarity to those presented here. The insurer’s effort to characterize repeated acts of sexual abuse as merely continuous exposure to abuse conditions was clearly a stretch of reasoning, and the Court treated it as such. Here, in contrast, the facts indicate a continuous pattern of discharge of toxic materials, over a period of decades, generating continuing leaching and migration into soil and water throughout the complex and adjacent waters. The characterization of continuous exposure to conditions is far more apt.
Continental cites RLI Ins. Co. v. Simon’s Rock Early College, 54 Mass.App.Ct. 286 (2002), which involved policy language similar to that in issue here. The case arose from a shooting spree by a college student that caused the death of two and injuries to four others within an eighteen-minute period. 54 Mass.App.Ct. at 287. The underlying action alleged liability on the part of the college based on negligence in failing to prevent the student’s conduct. Id. at 289. The Court began with the undisputed proposition that “the number of occurrences is determined by the cause theory, which construes occurrence by reference to the cause or causes of the injury.” Id. (internal quotations and citations omitted). Proceeding to the more difficult task of identifying the cause, as between the student’s conduct in committing the shootings, and the college’s conduct prior to the shootings, the Court concluded that “we must look to the ‘cause’ of the injury by reference to the conduct of the insured for which coverage is afforded, and that ‘cause’ and ‘occurrence’ are indistinguishable for purposes of this analysis.” Id. at 290. On that basis, distinguishing Fells Acres, the Court concluded that the underlying claims presented a single occurrence, because all arose from the college’s allegedly negligent acts or omissions in failing to prevent the student’s shooting spree. Id. at 291, 294-95.[14]
Here, the conduct of the insured giving rise to the underlying claims is its ownership of the complex, and its conduct of operations there in such a manner as to permit (or fail to prevent) discharges of toxic materials into the environment, combined with its failure to remedy the contamination resulting from such discharges.[15] The discharges, of course, happened repeatedly over a period of decades; indeed, the parties agree that it would be impossible to identify discrete discharges or to trace the contamination resulting from any particular discharge. Here, as in Simons Rock, the policy language “clearly contemplates the possibility that multiple acts taking place over a space of time may contribute to a single occurrence for purposes of coverage.” Id. at 294. It follows that the contamination on the site, arising from multiple discharges over time, constitutes one occurrence.
Keyspan’s argument addresses space as well as time; it contends that the six operations conducted at the complex should be treated as separate sites, or “premises locations” in the language of the policies. The reasoning of Simons Rock, as well as the facts provided in the record, refute the theory. The conduct of the insured giving rise to liability, which, Simons Rock teaches, must be the focus, was the same with respect to the entire complex. Eastern owned the entire complex as one parcel of land during the relevant time period, and conducted interrelated operations throughout the complex. Although certain of the facilities generated wastes different from others, resulting in soil contamination identifiable to particular parts of the complex, all of the contaminants resulted ultimately from the processing of tans generated by the coke works, and all of them contributed to the pollution of the nearby waters. Eastern operated the entire site in a manner that permitted contamination, and then failed to remove the contamination. That single pattern of conduct is the basis of its liability and, under the policy definition, constitutes one occurrence.
Keyspan cites a set of environmental cases, none of which undermines this conclusion. In Endicott Johnson v. Liberty Mut. Ins. Co., 928 F.Sup. 176, 180 (N.D.N.Y.1996), the underlying claim arose from conduct of the insured over a number of years in releasing toxic materials at two locations, a landfill in one town, and a barrel recycling facility in another. Applying policy language similar to that present here, the court rejected the insured’s claim of multiple occurrences, as well as the insurer’s claim of a single occurrence, and concluded that the claims presented one occurrence at each of the two separate locations. Id. at 181. The case provides no support for Keyspan’s theory of multiple locations on the Everett complex; in contrast to this single complex under common ownership containing multiple interrelated operations, the two sites there were entirely unrelated, under separate ownership, performing separate functions, and located in separate municipalities.
*518 CadetMfg. Co. v. American Ins. Co., 391 F.Sup.2d 884, 893 (W.D. Wash. 2005), similarly involved multiple releases over time at two sites. The sites were closer than those in Endicott-Johnson — 1000 feet apart — but they were not contiguous, and manufacturing operations had not been conducted on them at the same time. The Court treated the claims as presenting two occurrences, one at each site. Id. at 894. See also American Employers’ Ins. v. Swiss Reinsurance America Corp., 413 F.3d 129, 135 (1st Cir. 2005) (disparate leaks and spills over the policy period constitute a single event); Domtar, Inc. v. Niagara Fire Ins. Co., 2004 WL 376951 at *4 (Minn.App. 2004) (continuous and repeated exposure at a single site constituted one occurrence; contamination at six geographically and geologically separate sites constituted six occurrences); Norfolk Southern Corp. v. California Union Ins. Co., 859 So.2d 167, 192 (La.App.Ct. 1st Cir. 2003) (numerous releases over multiple years constituted single occurrence); Foust v. Ranger Ins. Co., 975 S.W.2d 329, 335 (Tex.App. 1998) (drift of herbicide from multiple aerial passes in one day was one occurrence); Outboard Marine Corp. v. Liberty Mut. Ins. Co., 670 N.E.2d 740, 748 (Ill.App. 2 Dist. 1996) (contamination of harbor over time was single occurrence). Contrast Colonial Gas v. Aetna Cas. & Sur. Co., 823 F.Sup. 975, 983 (D.Mass. 1993) (liability for installation of UFFI in 400 homes was single occurrence because liability arose from single cause); Indiana Gas. Co., Inc. v. Aetna Cas. & Ins. Co., 951 F.Sup. 773, 778 (N.D. Ind. 1996) (genuine issues of material fact where exposure occurred at several different manufactured gas plants located in different towns, using different processes, structures, and materials at different times, operated by different entities, not under common ownership). Continental is entitled to summary judgment ruling that the claims against Keyspan represent a single occurrence under the policies.
CONCLUSION AND ORDER
For the reasons stated, Defendant’s Motion for Summary Judgment (Trigger of Coverage) is DENIED, and summary judgment is granted to the plaintiff on the issue of trigger of coverage pursuant to Mass.R.Civ.R 56(c); Plaintiffs Motion for Summary Judgment on Misrepresentation and “Known Loss” is ALLOWED; Defendant’s Motion for Summary Judgment (Known Loss) is DENIED; Defendant’s Motion for Partial Summary Judgment (“Occurrences”) is ALLOWED; and Plaintiffs Motion for Summary Judgment on the Number of “Occurrences” is DENIED. Counsel are directed to confer in an effort to reach agreement on a scheduling order for the proceedings necessary to bring these cases to conclusion, and to contact Suffolk County Assistant Clerk Claire Walsh, at 617 788-8152, to schedule a status conference.

The Island End River is a short tidal channel that flows into the Mystic River which flows into Boston Harbor.

Eastern offers evidence that Koppers also obtained tar from other sources.

David Lang, LSP, defendant’s expert site professional, indicates in his report that the cities of Everett and Chelsea, as well as Exxon Mobil, dumped construction waste at the oxbow.

Continental purports to dispute that each of these measures was actually implemented, but offers no contrary evidence. It appears undisputed that, as Continental emphasizes, neither Eastern nor Koppers took steps at that time to remove the contamination that had already occurred.

NAPLs are those materials, like oil, that do not mix readily with water.

For example, contamination from the tar refinery consisted of NAPLs; at the tar transfer station both NAPLs and dense NAPLs (DNAPL) extending well below the surface of the ground; at the oxbow PAH’s and BTEX; at the byproducts and benzol plants BTEX and NAPLs; and at the coke works primarily PAHs and NAPLs.

The parties do not dispute that contamination of soil and groundwater by the release of toxic materials constitutes property damage. See Hazen Paper Co. v. United States Fidelity and Guar. Co., 407 Mass. 689, 698 (1990).

Different policy language led to the opposite conclusion in A.W. Chesterton, 445 Mass. at 520-21, to be discussed further infra

 Che First Circuit construed a policy very similar to those in issue here in Eagle-Picher Indus. Inc. v. Liberty Mut Ins., 682 F.2d 12, 24 (1st Cir. 1982), an early entry in the line of cases addressing coverage for asbestos-related injury. One of the policies at issue in that case required that the “occurrence” be during the policy period. The court viewed that requirement as ambiguous, because it could be read either as simply emphasizing that the exposure must result in personal injury during the policy period, or as requiring that the exposure and the injury take place while the policy was in force. The Court resolved the ambiguity in favor of the insured. See Hazen Paper Co., 407 Mass. at 700. The Supreme Judicial Court indicated in A.W Chesterton that it was “not inclined to follow the construction adopted by the court in Eagle-Picher in plainly different circumstances.” 445 Mass. at 522.

Keyspan also moves for summary judgment on Continental’s defense of misrepresentation. Continental concedes that it has no evidence of misrepresentation, and that summary judgment is proper as to that issue.

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§9601-75, was enacted in 1980. The corresponding Massachusetts statute, G.L.c. 21E, was enacted in 1983.

The Court cited Appalachian Ins. Co. v. Liberty Mut Ins. Co., 676 F.2d 56, 61 (3rd Cir. 1982), where, addressing claims of liability arising from the insured’s adoption of discriminatory employment policies, the court stated: “[t]he fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence.”

The Court has not overlooked the fact that Koppers leased part of the complex and conducted independent operations. Eastern remained the owner, as well as the supplier of at least part of the coke processed by Koppers. Its status as a potential responsible party under G.L.c. 2 IE arises from those roles.